BALDWIN'S STEEL ERECTION CO., INC. *vs.* CHAMPY CONSTRUCTION COMPANY, INC. & another.

Middlesex. December 8, 1967. — March 1, 1968.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & SPIEGEL, JJ.

*Contract,* Building contract, Substitution of new contract. *Agency,* Scope of authority or employment. *Evidence,* Hearsay.

Evidence warranted a finding that the general manager of a construction company building a public school had authority in behalf of the company to enter into a subcontract for erection of steel in the building. [715]

A finding was warranted on the evidence that, when it appeared that the quantity of steel to be erected in a school building under construction was substantially greater than the quantity on the basis of which the contractor and a subcontractor had made a subcontract for the erection of the steel at a lump sum price, the parties mutually and effec-

tively substituted for such subcontract a new subcontract providing for payment for the erection work at a per-ton rate.  [715]

In a proceeding to enforce payment for erection of steel by the plaintiff in a building under a subcontract with the general contractor providing for payment at a per-ton rate, testimony by a representative of the plaintiff stating the quantity of steel erected and that the quantity had been given him by the supplier of steel was not inadmissible as hearsay where it appeared that one of the terms of the subcontract was that the "volume of steel involved" was to be the figure furnished by the supplier.  [715–716]

BILL IN EQUITY filed in the Superior Court on September 5, 1963.

The suit was heard by *Kalus*, J.

*Salvatore J. Basile* for Champy Construction Company, Inc.

*Henry M. Polese* for the plaintiff.

SPIEGEL, J.   The plaintiff brought this bill in equity under G. L. c. 149, § 29, to establish its right to payment for labor and materials furnished by it in the construction of a school in the town of Andover.   The trial judge made "Findings, Rulings and Order for Decree" which he adopted as his "Report of Material Facts."   He found "that the defendant, Champy Construction Company, Inc. [Champy], is indebted to the plaintiff in the sum of $5,730.00, which sum represents the balance due the plaintiff for materials furnished and labor performed."   A final decree was entered ordering Champy to pay this amount (plus interest) to the plaintiff.[1]   Champy appealed from this decree.

Champy contends that "[t]he judge's findings and the final decree are not supported by the reported evidence." In view of this contention, we summarize relevant portions of the evidence.   Sometime in September of 1961, William Baldwin (Baldwin), the president and general manager of the plaintiff corporation, visited the site of the school construction at the request of Champy.   The work was already in progress.   There he met with Bernard Champy (Bernard), the general manager of the defendant.   Bernard asked Baldwin if he were "interested in the job" of erecting steel

---

[1] The bill was "dismissed as to the defendant . . . Town of Andover."

at the school site and in "giving a price." Baldwin said that he was interested and asked Bernard the tonnage involved. Bernard told Baldwin there were 60 tons of structural steel and 39 tons of reinforcing steel. Bernard also showed Baldwin plans of the proposed construction, and Baldwin took these away from the site with him, and examined them "for the purpose of determining the labor involved so that he . . . [could] give the contractor a unit price, but he could not and did not determine from the plans the volume of steel involved." The next day Baldwin returned to the job site to discuss the price of the work with Bernard. Baldwin first submitted a price of $70 a ton for the reinforcing steel and about $68 a ton for the structural steel. They "haggled a bit" and finally "came to an agreement that . . . [the plaintiff] would do the job for $6400. That was $60 a ton of structural and $39 a ton of reinforcing." Baldwin wrote out a proposal to this effect and gave it to Bernard. The latter told Baldwin that he "didn't sign any contract," but that his "sister would sign the contract and return them" to the plaintiff. (A copy of the first proposal was admitted in evidence bearing the signatures of Bernard and Baldwin.) This proposal was not signed in Baldwin's presence, nor was it returned to him. Shortly thereafter, and before the plaintiff commenced work, Baldwin learned that the construction would involve 165 tons of structural steel instead of the 60 tons he had been told by Bernard. Within a few days Baldwin returned to the job site and told Bernard, "You've made a mistake on your tonnage on your structural steel. It's 165 ton of structural steel instead of 60 ton. . . . I've got the tonnage." Bernard said that he would get the right tonnage from Lyons Iron Works, Inc. (Lyons), the steel supplier. Baldwin said that he could not do the work at the previously agreed price, and gave Bernard a second written proposal calling for "$56 per ton." Bernard told Baldwin that he would "tear up the . . . first proposal and . . . take the second one . . . to his sister and his sister would sign the contract," which would be returned to the plaintiff. The

plaintiff never received this contract. The plaintiff commenced work on the project in October of 1961. Baldwin visited the site several times and asked Bernard about the written contract. The latter said that he would send it, "[a]s soon as he found out the tonnage from Lyons." Later, Bernard entered the hospital, and Baldwin went to see Bernard's attorney, Mr. Salvatore Basile. Mr. Basile assured Baldwin that Champy was reliable and that the plaintiff would get its money. Baldwin told Mr. Basile that he "wanted the contract, but . . . [Mr. Basile] said . . . [Bernard] couldn't sign, he was sick, and there was nothing . . . [the plaintiff] could do but go ahead and finish the job." During the course of the work, two bills were submitted to Champy by the plaintiff "for 25 tons of reinforced steel at $60 per ton," and "for 40 tons of structural steel at $58 per ton," or a total of $3,820. Champy paid both bills. The work was completed on June 12, 1962. At that time the plaintiff billed Champy for the balance of "the complete amount of the whole job." In August, Baldwin met with Bernard and Mr. Basile in the latter's office. Bernard took no active part in the discussion, allegedly because he "was under the doctor's care and he couldn't do any talking." Baldwin was shown a copy of the first proposal, and for the first time saw that it bore Bernard's signature. Baldwin saw a copy of the second proposal in Bernard's hand, took it from him, and showed it to Mr. Basile. Mr. Basile then told Baldwin that "he wasn't going to pay" more than $6,400, and "that he accepted the first proposal . . . as a contract." Subsequently, Mr. Basile sent the plaintiff a check for $2,580, which was the difference between the previous payments and $6,400. (It was stipulated by the parties that this check was accepted without prejudice.)

The defendant argues that "the trial court erred in failing to recognize . . . [the first proposal] as the contract between the parties and to enter a decree based on it"; that this first proposal was agreed to by an agent of the defendant whose authority the plaintiff is estopped from disputing;

and that whatever the miscalculation that led the plaintiff to enter into the contract, it was not the product of fraud or mutual mistake.

"The authority of an agent is a question of fact, 'the answer to which depends upon the inferences to be drawn from a variety of circumstances . . . .' " *Costonis* v. *Medford Housing Authy.* 343 Mass. 108, 113. *Rintamaki* v. *Cunard S.S. Co. Ltd.* 205 Mass. 115, 117. *Lord* v. *Lowell Inst. for Sav.* 304 Mass. 212, 214. In the case at bar, the judge could have concluded that the signature sought from Bernard's sister was a mere formality. We are of opinion that there was ample evidence to justify a finding that Bernard had authority to enter into a binding contract on behalf of Champy. Bernard's authority was no less when he entered into an agreement with Baldwin based on the second proposal.

The effective substitution of an executory contract requires no consideration beyond mutual releases from the prior obligations. *Rollins* v. *Marsh,* 128 Mass. 116, 120. *Zlotnick* v. *McNamara,* 301 Mass. 224, 226. It is not material here whether the mistake as to tonnage under the first agreement was mutual or unilateral, since that agreement was superseded by an effective new contract. There was evidence that a second agreement was entered into by the parties under which a per-ton rate was substituted for the lump-sum price of the first proposal. There was also evidence that the parties agreed that the first proposal would be destroyed. We are of opinion that the evidence clearly supported a decree based on the terms of the second agreement.

The defendant also claims error in the judge's failure to strike Baldwin's testimony that the plaintiff erected 165 tons of structural steel and 39 tons of reinforcing steel. Baldwin testified that these figures had been given him by the supplier, Lyons. There was also testimony from Bernard that he would talk to Lyons from whom he would get the figure of the total amount of tonnage. It is argued that because Baldwin did not have personal knowledge of the total

amount installed, this testimony was hearsay and therefore inadmissible. This argument ignores the fact that the judge could have found that under the terms of the final agreement the "volume of steel involved" was to be the figure furnished by the steel supplier.

*Decree affirmed with costs of appeal.*