**SELAME ASSOCIATES, INC.**

v.

**HOLIDAY INNS, INC.**

**Civ. A. No. 71–1044–G.**

United States District Court,
D. Massachusetts.

Promulgated May 11, 1978.

Richard A. Dempsey of Glynn & Dempsey, Boston, Mass., for plaintiff.

Samuel Hoar and Alix Smullin of Goodwin, Procter & Hoar, Boston, Mass., for defendant.

## FINDINGS OF FACT
and
## CONCLUSIONS OF LAW

MALETZ, Judge:[1]

*Findings of Fact*

1. (a) Jurisdiction in this action is based on diversity of citizenship. Plaintiff Selame Associates, Inc. (Selame) is a Massachusetts corporation. Defendant Holiday Inns, Inc. (Holiday Inns) is a Tennessee corporation. The amount in controversy exceeds $10,000.00.

(b) The action arises out of the sinking of the ferry boat CHESAPEAKE, owned by the plaintiff Selame, while it was tied to the National dock, owned by the defendant Holiday Inns. The incident occurred on January 1, 1969.

Selame's complaint is in two counts. In the first count, Selame alleges that Holiday Inns agreed to accept into its care and custody and to moor at its pier in East Boston the ferry boat CHESAPEAKE. The second count contains the allegation that Holiday Inns agreed to accept into its custody as bailee and moor at its pier in East Boston the ferry boat CHESAPEAKE. In each count it is alleged that the failure of the defendant to properly secure the ferry boat caused it to sink. At trial, plaintiff sought to prove damages in the amount of $64,946.86 for the loss of the CHESAPEAKE and for costs related to attempts to salvage the CHESAPEAKE.

2. Joseph Selame was at all relevant times the president of and principal stockholder in Selame, as well as Selame's chief designer. Eleanor Selame is Joseph Selame's wife and was at all relevant times executive vice president and director of marketing for Selame.

3. Selame is a small corporation engaged in the business of industrial design. More particularly, Selame's business consists of designing symbols and signatures for corporations to help enhance their images and includes designing stores, interiors and packaging. Among the corporations which have employed Selame's services are Stop & Shop Corporation, General Cinema Corporation, Singer Corporation, Ludlow Corporation, Itek, Mr. Donut of America and Grand Union Stores. Examples of the individuals representing Selame's corporate clients with whom Mr. Selame dealt are the head of the store planning division (Stop & Shop), the treasurer (General Cinema) and marketing director (various bank clients).

4. (a) Holiday Inns was the operator of a 15-acre waterfront complex located at the National dock in East Boston, Massachusetts. The waterfront complex contained a large restaurant known as the Boston 1800. It also contained a number of gift shops, a museum whose purpose was to attract customers to the restaurant, a few commercial tenants, a parking lot and the National dock. In keeping with the waterfront location of the complex, the restaurant had a nautical decor. The Boston 1800 was originally owned by Alfred M. Johnson and Associates.

(b) The 15-acre parcel of land described in the preceding paragraph was divided into three lots. Lot A, containing the Boston 1800 restaurant, was owned after July 1968 by a trust formed by Holiday Inns and Alfred M. Johnson. Holiday Inns leased the restaurant from the trust. Holiday Inns owned the National dock which was located at Lot B.

(c) Holiday Inns intended to construct a motel on the property.

5. (a) The replica clipper ship FLYING CLOUD, 190 feet in length, was moored at the National dock to attract customers to the Boston 1800 restaurant and was also used as a cocktail lounge on two occasions. The FLYING CLOUD was originally built and docked at the National dock by Alfred M. Johnson and at the times relevant here was owned by the trust comprised of Holiday Inns and Alfred M. Johnson.

---

1. Judge of the United States Customs Court sitting by designation pursuant to 28 U.S.C. § 293(b).

(b) The pilot boat ROSEWAY and a schooner were moored at the National dock. On occasion, private yachts docked at the foot of the pier where Holiday Inns had a small landing for customers using the restaurant.

6. William Zammer was the general manager of the Boston 1800 restaurant. The restaurant grossed $2,000,000.00 to $3,000,000.00 a year and had 150 employees, all of whom worked under the control and supervision of Mr. Zammer. Mr. Zammer had department heads under him including the chef, maitre d', manager of the bar and comptroller, and had the ultimate authority over the hiring of all personnel. He had a private office and a secretary. He was paid $20,000.00 a year together with expenses and a car was available to him. There were administrative personnel working at the restaurant under Mr. Zammer's control such as the office manager and cashiers. The business card of Mr. Zammer stated that he was the general manager of the Boston 1800 "Home of the FLYING CLOUD." He was in charge of and directed the maintenance of the FLYING CLOUD. Mr. Zammer had charged of new construction on the restaurant premises and thus was in charge of and directed the construction of a banquet hall. He was in charge of repaving the parking lot and he had the responsibility of inspecting a building under construction at the waterfront complex by a lobster company to insure that it conformed to the lease which the lobster company had with Holiday Inns.

7. Mr. Zammer had actual authority to enter into a contract with Selame to moor and thereafter care for the CHESAPEAKE.

8. Mr. Zammer had no authority to bind Holiday Inns to a lease; only corporate officers of Holiday Inns had that authority.

9. Holiday Inns is a large corporation with a usual place of business in Memphis, Tennessee. It has 30,000 employees. In this corporation Mr. Zammer had two direct superiors. One was Hugh Jones, divisional senior vice president and a corporate vice president who was in charge of the Inn Operations Department of Holiday Inns' Food and Lodging Division. The other was Jay C. Spear who headed a division within the Inn Operations Department that was called Specialty Restaurant Division. The Boston 1800 restaurant was in the Specialty Restaurant Division. Mr. Zammer, the general manager of the Boston property, including the Boston 1800 when it was owned by Alfred M. Johnson, was hired by Mr. Spear to continue as general manager of the restaurant after July 1968. During the period 1968–1969, Mr. Spear was based in Memphis but lived in Boston and spent about four or five days every six weeks at the Boston 1800 complex. Mr. Zammer was the senior executive of Holiday Inns at this complex. Both Mr. Jones and Mr. Spear knew before the CHESAPEAKE sank that she was moored at the National dock.

10. In the fall of 1968, Selame contemplated a change in its business location and sought office space in the area of the Boston waterfront. Since such space was not available, Selame decided to look for a ferry boat and to moor it to a wharf for an office. Mr. Selame, at least, knew nothing about boats. Ship brokers were contacted and in November, 1968 Selame was advised of the ferry CHESAPEAKE then lying in Norfolk, Virginia. The ferry was inspected by Mrs. Selame and Arthur Kurlansky, an employee of Selame, and was later surveyed by Coast Engineering Co. The vessel was found to be entirely suitable for Selame's purposes.

11. The CHESAPEAKE was a car and passenger ferry which operated in the Chesapeake Bay area until it had been decommissioned due to the construction of a bridge. The ferry was 150 feet in length and at the time of purchase was still in operating condition with main engines, operable generators and full equipment. Due to its construction as a ferry it had an overhanging body with a rub rail extending past the hull of the vessel some three to five feet. The vessel had been documented while it was operating as a ferry but its documentation was withdrawn in April 1968 since it was necessary to perform repairs on the vessel.

12. After inspecting the CHESAPEAKE, Selame investigated locations in Boston harbor where the CHESAPEAKE could be moored. One place it contacted was Commercial Wharf, which wanted a fee of about $7,000.00 a year.

13. On or about December 2, 1968, Mrs. Selame saw an ad for rental space, not docking space, at the Boston 1800 and called to ascertain if it had any docking space available. She received a call that same afternoon from Mr. Zammer. A meeting was arranged for later that afternoon at the Boston 1800 restaurant to discuss the matter. During the meeting between Mrs. Selame (who was accompanied by Mr. Kurlansky) and Mr. Zammer in the latter's private office, various employees such as the chef, waitresses and construction personnel entered the office to ask questions.

At the meeting Mr. Zammer stated that he was the general manager of the restaurant. He said that Holiday Inns intended to build a hotel which the construction crew then working in the complex would construct. Mr. Zammer was very interested in having the CHESAPEAKE moored at the dock because it would attract customers to the restaurant and clients of Selame would use the restaurant. Mr. Zammer showed Mrs. Selame the shops being renovated and the banquet hall being constructed. Mr. Zammer stated that Holiday Inns would be of great help in taking care of the CHESAPEAKE and that rental of the mooring space for $300.00 to $400.00 a month, as proposed by Mrs. Selame, seemed fine. After viewing the 1800 complex with Mr. Zammer, Mrs. Selame called her husband, Mr. Selame, and advised him that the location appeared to be what they wanted.

14. Later that day, Mr. Selame went to the 1800 restaurant and met Mr. Zammer in his private office. Mrs. Selame and Mr. Kurlansky were also present. During the conference various Holiday Inns employees entered the office requesting instructions from Mr. Zammer. Mr. Zammer pointed out some of the things he had done and was working on, such as constructing a banquet hall to add seating capacity to the restaurant. Mr. Zammer also showed Mr. Selame blueprints of the proposed hotel. During the conference Mr. Zammer stated that he had experience in handling and mooring vessels and showed Mr. Selame how the FLYING CLOUD was docked with a camel. Mr. Zammer was excited about having the CHESAPEAKE at the dock and pointed out where it would be docked. He said the CHESAPEAKE would enhance the environment and pay rent. Mr. Zammer also said that Wilbur L. Brown, an employee of Holiday Inns, had maritime experience and cared for the FLYING CLOUD.

15. On or about December 3, 1968, an oral agreement was reached with Mr. Zammer that Holiday Inns would properly moor and thereafter care for the CHESAPEAKE at the National dock, including performing the necessary construction. The rental would be $400.00 a month. Selame would be billed for those services. An oral agreement was also reached with Mr. Zammer that, subject to approval by the main office of Holiday Inns, Holiday Inns would lease to Selame docking facilities at the National dock for the CHESAPEAKE for a period of ten years at a rental of $400.00 a month. Mr. Zammer stated that he had no authority to make a lease.

16. If Mr. Selame did not get an agreement for a ten year lease at the National dock from Holiday Inns, he intended to bring the CHESAPEAKE to the other side of the harbor.

17. Mr. Zammer had apparent authority to contract for Holiday Inns with Selame to moor and care for the CHESAPEAKE. Mr. Selame reasonably believed that Mr. Zammer as general manager for Holiday Inns had full authority to enter into the contract. Mr. Zammer had an impressive private office with a secretary. Employees continually entered the office asking questions. Mr. Zammer had access to all the blueprints of the proposed buildings and was in charge of constructing a banquet hall. The FLYING CLOUD was managed by Mr. Zammer who had an employee experienced in maritime matters to care for the vessel. Several other vessels were moored

on the premises. Mr. Zammer appeared to be intelligent and there was sufficient reason for Mr. Selame to believe that he was in charge with full authority.

18. As a result of these agreements with Mr. Zammer, Mr. Selame decided to purchase the CHESAPEAKE. Negotiations with the owner of the CHESAPEAKE resulted in a purchase of the vessel for $21,000.00. Thereafter substantial expenses were incurred in preparing for and towing the CHESAPEAKE to Boston. The sale was completed on December 13, 1968. On the same day, Mr. Selame called Mr. Zammer. Among other things, Mr. Zammer requested Mr. Selame to send him a written proposal for a ten year lease, which proposal, Mr. Zammer indicated, would require approval by Holiday Inns' main office. Accordingly, on that same day, December 13, 1968, Selame sent a letter written by Mr. Selame and Mr. Kurlansky to Mr. Zammer which read as follows:

This letter will confirm our agreement reached on December 3, 1968 regarding docking of "Chesapeake" adjacent to the Flying Cloud.

We agree to pay $400 per month commencing on March 1, 1969 for a term of ten (10) years as full consideration for such docking facilities. In addition, we anticipate that we will have the option to extend the lease for another ten (10) years.

I believe that this should summarize our agreement satisfactorily. If so, please confirm in writing.

As soon as you have received the formal lease, kindly forward same for execution.

No written confirmation or oral acceptance of the proposal for a ten year lease was ever received.

19. Mr. Jones knew of the arrangement for mooring the vessel and that Mr. Selame had requested ten year dockage. Mr. Jones knew of the proposed mooring of the CHESAPEAKE before it arrived but did nothing to prevent it from mooring. He did not order Mr. Zammer to refuse to allow the CHESAPEAKE to moor, nor did he order it away once it had moored.

20. As set forth in finding 7, Mr. Zammer had actual authority to enter into a contract with Selame to moor and thereafter care for the CHESAPEAKE. Mr. Zammer also had implied authority from Holiday Inns to moor and care for the CHESAPEAKE. Mr. Jones knew that the CHESAPEAKE had docked at the Holiday Inns' property and that Selame had proposed ten year dockage. Mr. Jones did not order Mr. Spear or Mr. Zammer to have the CHESAPEAKE moved but stated, "I at that time told him that I didn't think it fit our image or fit into the overall plans that we envisioned for the complex and I didn't think it was a good idea."

21. During the initial conference with Mr. and Mrs. Selame, Mr. Zammer knew that Selame did not own the CHESAPEAKE but that it would be purchased after suitable mooring was arranged. Thereafter Mr. Zammer was aware that the CHESAPEAKE would have to be brought from Norfolk to Boston at considerable expense.

22. Wilbur L. Brown, head of the maintenance department of the 1800 restaurant, together with Emil McCarthy, a carpenter employed by the restaurant, were told by Mr. Zammer that the CHESAPEAKE was arriving and were ordered to prepare the berth for the CHESAPEAKE. Mr. Zammer selected the berth where the CHESAPEAKE would be placed. Part of the duties of Mr. Brown as director of maintenance was to care for and maintain the FLYING CLOUD. Thus, Mr. Brown watched over its mooring lines and pumped the vessel when necessary.

23. Prior to the departure of the CHESAPEAKE from Norfolk on December 26, 1968, Mr. Brown requested Mr. Zammer to obtain blueprints of the CHESAPEAKE to determine what equipment was needed and to locate the cleats. After reviewing the blueprints Mr. Brown and Mr. Zammer discussed the necessary equipment including cleats, lines and camels. Mr. Brown ordered equipment including lines and cleats necessary to moor the CHESAPEAKE. These items were billed to the FLYING

CLOUD. At all times while preparing the berth, both Mr. Brown and Mr. McCarthy were on the payroll of Holiday Inns and paid by Holiday Inns. When Mr. Brown performed the work to prepare the berth, he was acting at the direction of Mr. Zammer who gave him specific orders. Mr. Brown and Mr. McCarthy worked one to two days preparing the berth. When Mr. Selame advised Mr. Zammer that the CHESAPEAKE had sailed from Norfolk on December 26, 1968, Mr. Zammer said that the berth was being prepared for the CHESAPEAKE and that everything was all set.

24. The CHESAPEAKE arrived at the National dock at about 8:30 A.M., December 30, 1968.

25. The CHESAPEAKE was towed from Virginia to Boston harbor by a tugboat owned by Curtis Bay Towing Co. A smaller tugboat owned by Ross Towboat Co. was called in when the CHESAPEAKE arrived in Boston harbor to maneuver the CHESAPEAKE into the National dock. Mr. Brown handled the lines on the pier when the CHESAPEAKE arrived. Mr. Zammer assisted with the lines and directed the operation.

26. When the CHESAPEAKE arrived it was listing slightly in the front because of a considerable amount of water which had entered the forward void.

27. A camel is a wooden structure that is placed between the dock and the vessel to keep the vessel away from the dock. The FLYING CLOUD and the other vessels moored at National dock had camels. Due to its overhanging superstructure a ferry needs a camel to prevent it from hanging up on the dock. Mr. Zammer knew that a camel was necessary to properly moor the CHESAPEAKE. Breast lines which run from the offshore side to the opposite pier or to anchors serve the same purpose. The cost of installing either a suitable camel or breast lines for the CHESAPEAKE would be about $600.00. In the case of the CHESAPEAKE, telephone poles with truck tires had been placed in the berth alongside the pier to serve as camels. These telephone poles were intended to keep the CHESAPEAKE away from the pier and prevent it from rising above and on top of the pilings. However, these camels were too small for the overhanging rub rail and therefore could not keep the CHESAPEAKE off the pier so as to prevent it from hanging up. A proper camel would have to be five feet to seven feet wide.

28. Mr. Selame was present when the CHESAPEAKE was moored and went aboard for a short period but then left. Mr. Zammer went on board on two or three occasions and on one occasion he was on board with a carpentry contractor.

29. After the CHESAPEAKE was moored, Mr. Brown requested permission from Mr. Zammer to open various hatches and to rent pumps in order to pump the water out. Permission was granted and the water was pumped out by Mr. Brown and Mr. McCarthy, who were paid by Boston 1800. Mr. Brown and Mr. McCarthy spent most of a day and into the night pumping out the water with a 4½ inch pump. A hole was cut in the deck to pump the water out.

30. About 10:00 A.M. on January 1, 1969 Mr. McCarthy went to the CHESAPEAKE to check it. The tide was very high and the weather was windy and cold. Mr. McCarthy noted that the CHESAPEAKE was hung up on the pier. Mr. McCarthy telephoned Mr. Zammer at home and advised him that the ferry was hung up on the pier and that he should get a tow boat to tow it off. When asked what would happen, Mr. McCarthy stated that he thought it would free itself when the tide went out and was told by Mr. Zammer to stay in touch. Mr. McCarthy made a second call to Mr. Zammer about noon advising that the tide was going out and the ferry was listing. He further told Mr. Zammer that he thought the weight of the ferry would crush the cap log and the ferry would right itself. Between 1:30 and 2:00 P.M. a third call was made by Mr. McCarthy who warned Mr. Zammer that the CHESAPEAKE might slide off and hit the FLYING CLOUD. Mr. Zammer said he would be right down.

31. Mr. Selame went to visit the CHESAPEAKE about noontime, January 1, 1969. When he arrived he saw that the CHESAPEAKE had taken a 15 or 20 degree list due to the fact that its inshore side was suspended on a cleat. The tide was ebbing. Some employees of Holiday Inns who were in the restaurant advised Mr. Selame that they were waiting for Mr. Zammer.

32. Mr. Zammer arrived and immediately went to his office with Mr. Selame. Mr. Zammer called the Coast Guard and the Boston fire department. He also called Boston Towboat Co. A tug from Boston Towboat came to the berth but refused to pull the CHESAPEAKE off. Mr. Zammer then rented a bulldozer through a friend. When the bulldozer arrived, Mr. Zammer got into the cab of the bulldozer with the operator of the machine and attempted for the next several hours to push or pull the CHESAPEAKE away from the pier, without success. As the tide came in, water entered the hatches which had been opened to pump out the water, sinking the CHESAPEAKE at the berth.

33. After the casualty occurred, Mr. Selame hired Mr. Brown as an independent contractor to work for him in attempting to raise the CHESAPEAKE. Mr. Brown attempted to raise the vessel by using tanks but was unsuccessful. Selame paid Mr. Brown a total of $3,245.86 for labor and equipment. Over the next 18 months six professional salvors attempted to raise the vessel on a "no-cure-no-pay" basis and were also unsuccessful due to the CHESAPEAKE's extreme sunken angle and location in the berth. The CHESAPEAKE was ultimately sold to Holiday Inns for $1.00.

34. The damages incurred by Selame as a result of the loss of the CHESAPEAKE are as follows:

| | |
|---|---|
| Cost of CHESAPEAKE ......... | $21,000.00 |
| Coast Engineering Co. .......... (For survey and inspection of CHESAPEAKE) | 1,198.00 |
| Moon Engineering Co. .......... (For furnishing labor, material and equipment on CHESAPEAKE prior to towing) | 2,283.00 |
| Paterson, Wylde, Windler, Inc. ... (Insurance premium) | 900.00 |
| Curtis Bay Towing Co. .......... | 6,200.00 |
| Ross Towboat Co. ............. | 100.00 |
| Wilbur L. Brown (Salvage) ...... | 3,245.86 |
| Total | $34,926.86 |

35. Selame is entitled to pre-judgment interest, at the rate specified by Massachusetts law, from May 19, 1971, the date of filing the complaint herein.

### Conclusions of Law

A. *The Contract to Moor the CHESAPEAKE was a Maritime Contract*

1. The contract to provide moorage or wharfage to the CHESAPEAKE was a maritime contract for the reasons set out below.

2. A mooring is a place to secure a vessel to a shore and is synonymous with a wharf. A contract to provide wharfage or storage is a maritime contract and a breach of this contract is cognizable in admiralty. *Bird v. S.S. Fortuna,* 232 F.Supp. 690, 691 (D.Mass.1964); *Fireman's Fund Ins. Co. v. Boston Harbor Marina,* 406 F.2d 917, 919 (1st Cir. 1969).

3. One of the elements in every maritime contract is the requirement that the contract concern a vessel. At the time of its sinking the CHESAPEAKE was a vessel since it was capable of being used as a means of transportation on water. See 1 U.S.C. § 3; *The Showboat,* 47 F.2d 286 (D.Mass.1930); *Miami River Boat Yd. Inc. v. 60' Houseboat,* 390 F.2d 596 (5th Cir. 1968); *Kilb v. Menke,* 121 F.2d 1013 (5th Cir. 1941); *United States v. Bethlehem Steel Co.,* 53 CCPA 142 (1966), *cert. den.* 386 U.S. 912, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967); *Vancor Steamship Corp. v. United States,* 406 F.Supp. 810 (Cust.Ct.1976).

4. The oral agreement to moor and care for the CHESAPEAKE was a maritime contract and as such the statute of frauds is not applicable. *Kossick v. United Fruit Co.,* 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). Further, the oral agreement was to moor and care for an indeterminate period. Since the time was not de-

termined, the contract could be performed within one year and is thus not governed by the statute of frauds. *Kelley v. Hansen,* 254 F.2d 99, 102 (1st Cir. 1958); *Dunne v. City of Fall River,* 328 Mass. 332, 104 N.E.2d 157, 159 (1952).

### B. Under Maritime Law and Common Law Principles, Holiday Inns is Liable for the Loss of the CHESAPEAKE

■ 5. Since Mr. Zammer agreed to moor the CHESAPEAKE and thereafter care for her while she was moored at the wharf, a bailment arose for the mutual benefit of the dock owner and the shipowner. This bailment imposed upon Holiday Inns a duty of ordinary care which in the present case required a proper camel. *Stegemann v. Miami Beach Boat Slips,* 213 F.2d 561, 564 (5th Cir. 1954); *Roah Hook Brick Co. v. Erie R. Co.,* 179 F.2d 601, 604 (2d Cir. 1950).

6. (a) Mr. Zammer was well aware that a proper camel or a breast line was necessary to keep the CHESAPEAKE away from the dock. The telephone poles placed in the berth to serve as a camel were too small. If a camel was not used, a breast line should have been run between the CHESAPEAKE and the opposite side of the pier to prevent her from overhanging the pier and becoming hung along her inboard side as subsequently occurred. The cost of constructing a proper camel or rigging breast lines would have been some $600.00. Any services provided in excess of the monthly rental would be billed to Selame.

■ (b) Negligence under maritime law or common law is conduct which involves an unreasonably great risk of causing damage. "[T]he standard of conduct which is the basis of the law of negligence is determined by balancing the risk, in light of the * * value of the interest threatened and the probability and extent of the harm, against the value of the interest which the actor is seeking to protect * * *." *Prosser Torts* (4th ed. 1971) § 31, p. 149. See also, e. g., *United States v. Carroll Towing Co.,* 159 F.2d 169, 173 (2d Cir. 1947). The standard of care under such circumstances is a func-

tion of three elements: the value of the CHESAPEAKE; the probability of damage to the CHESAPEAKE; and the burden of preventing the damage. Negligence is proved if the burden is less than the factor of the value and probability. *Ibid.*

■ (c) The value of the CHESAPEAKE at Boston including her acquisition cost and the cost of navigating her and towing her to the port in Boston totalled some $30,-000.00. The probability of her being hung was acknowledged by Mr. Zammer who conceded that a proper camel was necessary due to the range of tide and the construction of the hull. The necessity of a suitable camel is underscored by the fact that the CHESAPEAKE sank only two days after she was moored without a proper camel. The burden of avoiding this danger would be some $600.00 which would be recoverable from Selame in any event. Thus, the failure to provide a proper camel constituted negligence under the circumstances.

■ 7. Every maritime service contract contains an implied warranty of workmanlike performance. *Fairmount Shipping Corp. v. Chevron Oil Co.,* 511 F.2d 1252, 1259–60 (2d Cir. 1975). The warranty of workmanlike performance was breached in the present case by the failure to moor the CHESAPEAKE with a proper camel or breast lines. The initial breach was compounded by the later action of Mr. Zammer who did not take any immediate action when he was first notified by Mr. McCarthy on the morning of January 1, 1969 of the precarious position of the vessel. At that time the CHESAPEAKE could have been saved because it was still high water. Mr. Zammer did not respond to that call and it was not until the third call when the vessel was at an extreme list and had substantially been lost that Mr. Zammer came to the pier and attempted to rescue the vessel.

### C. Mr. Zammer Had Authority to Bind Holiday Inns to a Contract Relating to the Mooring of the CHESAPEAKE

■ 8. Mr. Zammer was general manager of a waterfront restaurant complex

grossing in excess of $2,000,000.00 to $3,000,000.00 a year. The complex was the "Home of the FLYING CLOUD" as stated on his business card. He had 150 employees together with department heads. The complex included shops and a museum. A hotel was planned to be constructed on the premises. Mr. Zammer was in charge of carpenters performing alterations and additions to the restaurant. He received a salary of $20,000.00 in 1969 together with expenses, and a car was available to him. He had a private office, a private secretary, a comptroller, and managers of the several departments. He was clearly a general agent of Holiday Inns in the organizational chain of command of Holiday Inns. Despite the fact that Holiday Inns was a large corporation with 30,000 employees, Mr. Zammer had only two superiors. They were Mr. Jones, corporate vice president of Holiday Inns, and Mr. Spear, director of the specialty restaurant division. Mr. Zammer had charge of the FLYING CLOUD. Mr. Zammer was the senior employee of Holiday Inns on the premises. Other vessels were moored at the pier and yacht owners moored their yachts at the wharf while using the restaurant. The above facts were proved by the testimony of Mr. Zammer and Mr. Jones. Although statements of an alleged agent out of court are inadmissible to prove his agency, the alleged agent may be called as a witness and the agency established by his testimony. *Eastern Paper & Box Co. v. Herz Mfg. Corp.*, 323 Mass. 138, 80 N.E.2d 484, 487 (1948); *Restatement, Agency* (2d), § 285.

After discussing the mooring of the CHESAPEAKE at the National docks wharf, Mr. Zammer advised his immediate superiors, Mr. Spear and Mr. Jones. Neither of his immediate superiors took any action or ordered him not to moor the vessel at the wharf. Mr. Zammer never indicated to Selame that he did not have authority to moor the CHESAPEAKE at the wharf. Mr. Zammer stated that he did not have authority to sign a ten year lease but this limitation did not apply to his authority to moor the vessel. Evidence of the fact that he had authority to moor the CHESA-

PEAKE is Mr. Jones' statement that he did not think it was a good idea because it did not "fit the image." That statement shows that Mr. Zammer had authority to moor the CHESAPEAKE even though the CHESAPEAKE was not considered by Mr. Jones to be a positive addition to the waterfront complex. This merely indicates a difference of opinion since Mr. Zammer believed that in addition to supplying revenue of $200.00 a month, the ferry would attract customers and would be a "curio" or an interesting object for regular users of the restaurant. Implied authority is simply actual authority proved circumstantially. Where the principal permits the agent to do an act without objection, implied authority is proven. *Stoneman v. Fox Film Corp.*, 295 Mass. 419, 4 N.E.2d 63, 66 (1936).

9. In addition, as general manager, Mr. Zammer had actual authority to moor the CHESAPEAKE. The law of agency provides that a general manager has the widest authority of all business agents and is in complete control of operations. He has authority to do what is normally done in a business of the same sort. As manager of the waterfront restaurant, Mr. Zammer testified that he was in charge of the FLYING CLOUD and the yachts moored at the dock. It is clear that a function of a waterfront restaurant is to provide such facilities. Thus Mr. Zammer had actual authority and as general manager bound Holiday Inns to the moorage contract with Selame. *Baldwin's Steel Erection Co. v. Champy Const. Co.*, 353 Mass. 711, 234 N.E.2d 763 (1968); *Neilson v. Malcolm Kenneth Co.*, 303 Mass. 437, 22 N.E.2d 20 (1939).

10. Since Mr. Zammer had authority to moor the CHESAPEAKE he had authority to do acts which were incidental or reasonably necessary to accomplish the mooring. *Beit Bros. v. Irving Tanning Co.*, 315 Mass. 561, 53 N.E.2d 702, 704 (1944); *MacDonald v. Gough,* 326 Mass. 93, 93 N.E.2d 260, 263 (1950); *Restatement, Agency* (2d), § 35. The proper mooring of the CHESAPEAKE by providing a camel or breast lines would cost $600.00. Certainly an expenditure at that level would be within the authority of

Mr. Zammer especially since he could immediately bill it back and recover the expenditures from Selame. Mr. Zammer had control of the FLYING CLOUD which had been safely moored at the wharf for several years. He had experienced employees, particularly Mr. Brown, to care for that vessel so that in agreeing to moor and thereafter care for the CHESAPEAKE, he was not doing anything, which as general manager, he had not already been doing with other vessels. It was not an act so entirely outside or contrary to his regular duties as general manager that it would clearly be outside his actual or implied authority.

11. The Holiday Inns was also bound to the contract made by Mr. Zammer based on the principle of ratification. In this instance, Mr. Jones and Mr. Spear knew of the proposed arrival of the CHESAPEAKE but did nothing to prevent it from arriving. When an agent conducts a transaction for his principal, the principal cannot await events and affirm or renounce as subsequent conditions might indicate. Prompt disavowal is required. One having knowledge of material facts but remaining silent when he should have spoken will be held to have ratified the agent's act. *Boice-Perrine v. Kelley,* 243 Mass. 327, 137 N.E. 731, 733 (1923).

Further, Selame changed its position in reliance on the contract. The CHESAPEAKE was purchased and moved to Boston in reliance on the contract for a mooring. Where there has been a change of position, the principal is bound to the contract. Seavey, *Agency* §§ 36E, 40.

12. Mr. Zammer also had apparent authority to contract for Holiday Inns with Selame to moor and care for the CHESAPEAKE. The authority of an agent is a question of fact "the answer to which depends upon the inferences to be drawn from a variety of circumstances relating to the conduct of the apparent agent, and whether the circumstances are such as to warrant persons dealing with him, in the exercise of reasonable prudence and discretion, to believe he has authority to represent the alleged principal in regard to the transaction in question." *Lord v. Lowell Institution for Savings,* 304 Mass. 212, 214, 23 N.E.2d 101, 102 (1939). See also *Eastern Renovating Corp. v. Forhan,* 391 F.Supp. 204, 205 (D.Mass.1975); *Costonis v. Medford Housing Authority,* 343 Mass. 108, 176 N.E.2d 25, 28 (1961); *Neilson v. Malcolm Kenneth Co., supra,* 303 Mass. 437, 22 N.E.2d 20; *Baldwin's Steel Erection Co. v. Champy Const. Co., supra,* 353 Mass. 711, 234 N.E.2d 763.

In the present case the broad authority of Mr. Zammer, his powers, his duties and his title would lead a reasonable person to believe that he as general manager of a waterfront restaurant would have authority to moor the CHESAPEAKE.

### Judgment Order

For the foregoing reasons, judgment will be entered for plaintiff in the amount of $34,926.86, with interest from May 19, 1971 and costs. Interest shall be computed at the rate specified by Massachusetts law.