**HUDSON RIVER CRUISES, INC.,**

v.

**BRIDGEPORT DRYDOCK CORPORATION.**

**No. 5:91CV00113 (WWE).**

United States District Court, D. Connecticut.

Nov. 10, 1994.

Order Amending Judgment Dec. 19, 1994.

Frederick A. Lovejoy, Norwalk, CT, for plaintiff.

Robert K. Marzik, Stratford, CT, for defendant.

## MEMORANDUM OF DECISION

EGINTON, Senior District Judge.

Plaintiff, Hudson River Cruises, Inc., brought this action alleging that defendant, Bridgeport Drydock Corporation, failed to repair plaintiff's steel-hulled vessel, the RIP VAN WINKLE, in a workmanlike manner and overcharged plaintiff for the inadequate repairs. Plaintiff's complaint sets forth defendant's alleged violations in six counts: Count I—Breach of Contract; Count II—Breach of Warranty; Count III—Negligence; Count IV—Punitive Damages; Count V—Violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. § 42–110a, *et seq.*; and Count VI—Loss of Use.

The case was tried to the court in February, March and April of 1994. Pursuant to Fed.R.Civ.P. 52(a), the court enters the following findings of fact and conclusions of law.

## I. PRELIMINARY FINDINGS

In the summer and fall of 1989 the parties entered into an executory oral contract whereby plaintiff agreed to deliver its vessel to defendant in late October of 1989 and defendant agreed to complete repairs and hull painting as itemized in an October 6, 1989 letter from plaintiff to Mr. Paul Walker, President of defendant corporation. Plain-

tiff's promise to compensate defendant for repairs is implied.

There was no meeting of the minds as to exactly when repairs would begin or when they would be completed. The "haul out" date and completion date remained tentative. Likewise, there was no meeting of the minds as to the final cost of the project. The parties agreed that estimates of charges would be conveyed, but no estimates were communicated.

It is common in the dry docking industry for a shipowner to tender his vessel for dry docking being aware only of the rates to be charged. A set contract price prior to repair is not always feasible. Necessary repairs often cannot be estimated until the vessel is out of the water and in dry dock.

In this case, there was a meeting of the minds as to certain rates to be charged: 1) a dry docking rate of $7.50 per foot "in and out"; 2) a "lay day" charge of $5.00 per foot, per day; 3) $50.00 per man-hour for welding and mechanical work; and 4) $40.00 per man-hour for unskilled labor. These rates are properly chargeable pursuant to the contract.

How the rates should be applied is another matter. The parties' agreement does not offer guidance as to the application of charges, e.g., is a ship owner to be charged during a worker's lunch hour? The court will look to industry custom to determine how to apply the charges.

## A. *Overcharges*

■ Issue # 1: when should plaintiff be charged for a lay day?

The court concludes that there is no common formula in the dry docking industry to determine when a lay day should be charged. Consequently, defendant's practice of charging a lay day when work is being performed on a vessel is acceptable.

Defendant charged plaintiff for eighteen lay days. Evidence presented at trial indicates that on two of the eighteen lay days no work was actually performed on plaintiff's vessel. Accordingly, plaintiff is liable for only sixteen lay days.

■ Issue # 2: did defendant overcharge plaintiff by billing worker's lunch time?

The custom of the industry is that hourly rates are not charged during lunch hours. Based on testimony and the invoices of Talmadge Brothers, plaintiff was improperly charged for twenty-one hours of lunch time. Additionally, based on testimony and the invoices of M.N. Carpenter Co., Inc., plaintiff was improperly charged for thirty-six hours of lunch time. In total, plaintiff was overcharged $2,640.00 for lunch time (i.e., Talmadge Brothers' hourly rate = $40.00 × 21 lunch hours = $840.00; M.N. Carpenter Co., Inc.'s hourly rate = $50.00 × 36 lunch hours = $1,800.00; and $840.00 + $1,800.00 = $2,640.00).

■ Issue # 3: did defendant overcharge plaintiff by charging the hourly work rate for subcontractor's travel time?

The welders subcontracted by defendant, M.N. Carpenter Co., Inc., billed thirty-six work hours for travel to and from the dry dock. Plaintiff was told that he would be charged $50.00 per hour for welding. The need to compensate the welders for their travel time was not communicated to plaintiff. The charge is not reasonable. Plaintiff is not liable for the thirty-six hours of travel time. The overcharge for travel time comes to $1,800.00 (36 hours × $50.00 per hour = $1,800.00).

Issue # 4: were the sandblasting charges reasonable?

■ If a vessel is tendered for repair and the parties fail to come to terms as to certain rates to be charged, reasonable rates as are customary in the industry will be presumed. Defendant charged plaintiff $1.20 per square foot of hull for sandblasting. The court finds this to be a reasonable rate.

The December 2, 1989 sandblasting charge of $3,600.00 is based on 3,000 square feet of hull. Since the RIP VAN WINKLE's hull is only 2,870 square feet the plaintiff was overcharged by $156.00 (2,870 square feet × $1.20 = $3,444.00; $3,600.00 − $3,444.00 = $156.00). Additionally, the billing invoices indicate that plaintiff was overcharged $120.00 for the second sandblasting job. A rate of $1.50 per square foot, rather than

$1.20 per square foot, was improperly applied.

Issue # 5: were the painting charges reasonable?

■ An estimate of the number of man-hours required to paint the RIP VAN WINKLE'S hull was never communicated to plaintiff. The court finds that the ninety-eight man-hours expended by defendant to paint the vessel is reasonable. Plaintiff was properly charged $3,920.00 for labor (98 hours × $40.00 per hour = $3,920.00).

■ Likewise, defendant's use of eighty gallons of hull paint was reasonable. While the paint manufacturer's specifications provide some evidence that defendant's paint consumption was excessive, hull surface irregularities and a thirty to forty percent loss factor must be taken into consideration. Plaintiff was properly charged $2,950.00 for consumed paint (50 gallons Ameron # 385 × $26.00 per gallon = $1,300.00; 30 gallons Ameron # 279 × $55.00 per gallon = $1,650.00; $1,300.00 + $1,650.00 = $2,950.00). The court also finds the price charged per gallon of paint acceptable.

## B. *Adequacy of Painting and Repairs*

Issue # 1: did defendant paint the RIP VAN WINKLE'S hull in a "workmanlike manner"?

■ Plaintiff alleges that defendant applied the hull paint in an unworkmanlike manner by: 1) painting over rust bloom; 2) painting when the air temperature was below the minimum application temperature; 3) ignoring drying times; 4) applying the paint with a roller rather than a spray gun; and 5) failing to apply the paint to a requisite thickness (mill rate). For the most part, the court agrees.

Paint was applied over rust bloom in disregard of the manufacturer's specifications that require the hull be "free of all contaminants." On two of the days when the Ameron # 385 was applied the air temperature was below the forty degree minimum application temperature. Defendant ignored the Ameron # 385 drying time specifications and the recommended application procedures "to obtain maximum performance." Consequently, defendant failed to apply the Ameron paint in a workmanlike manner.

Plaintiff further alleges that defendant, in contravention of an express oral warranty that the paint job would last five years, applied paint that would not last five years. The court finds that, while plaintiff asked defendant's president for a paint system that would last five years, defendant never orally or otherwise represented to plaintiff that the paint was guaranteed for any time period. No warranty of fitness for a particular time period was entered into by the parties with regard to the paint.

Issue # 2: does industry practice and custom require that a hull be "fleeted" after a paint job?

■ While many dry docking operations customarily fleet vessels, there is no industry practice whereby every time a hull is painted the blocked areas are fleeted. Rather, it is common in the industry to wait until the next dry docking where the vessel can be adjusted on its blocks to expose the non-fleeted hull portions.

Plaintiff was on notice that its vessel would not be fleeted.

Issue # 3: did defendant carry out the welding operations in a "workmanlike manner"?

■ Plaintiff alleges that defendant carried out the welding operations in an unworkmanlike manner by: 1) failing to properly choose and supervise its welding subcontractor; and 2) failing to properly execute the bottom plate welds.

The court finds that defendant's welding subcontractor, M.N. Carpenter, Co., Inc., employed qualified welders on the RIP VAN WINKLE job. Furthermore, the welding work was performed in a workmanlike manner.

The RIP VAN WINKLE was dry docked on November 20, 1989. The extent of steel repair was not known until the vessel was in dry dock and inspected. The Coast Guard examined the hull and required repair prior to dry docking credit approval. Extensive steel repair was necessary.

The welding work was closely monitored by the Coast Guard. On December 14, 1989 the final repairs were inspected and approved. Testimony indicates that the welders were under time constraints due to the Coast Guard's edict that welding be completed by December 15, 1989 and plaintiff's need to remove the vessel from dry dock before the icing of the Hudson. While the welding was rough in appearance, it was watertight, functional and met with Coast Guard approval. Considering the extent of the required repairs and the time constraints placed on the welding operations, defendant carried out the welding repair in a workmanlike manner.

Issue # 4: did defendant repair the RIP VAN WINKLE'S propeller in a "workmanlike manner"?

■ Plaintiff voluntarily elected to have defendant's subcontractor perform a dockside repair of the cracked propeller in the interests of "cost and speed." There is some evidence, although not conclusive, that the propeller repair failed. Whether the repair failed or a new crack appeared, plaintiff proceeded with a factory repair, rather than a dockside repair, at the second (Feeney) dry docking. Plaintiff was on notice that the original repair was of a temporary nature. Consequently, defendant repaired the plaintiff's propeller in a workmanlike manner.

## C. Storm Damage

■ On November 16, 1989 a severe storm damaged plaintiff's vessel while it was moored at defendant's dry dock. The damage included chafed mooring lines, a bent handrail, cracked pump and valve due to freezing, and miscellaneous abrasions and breakage. Some of the miscellaneous damage was repaired by defendant, the remainder is not in issue. The parties agreed to settle the matter via a $100.00 credit to plaintiff's account. At issue is what damage was covered under the settlement agreement.

The court finds that the parties agreement covered the bent handrail and the chafed mooring lines. Plaintiff was aware of these damages when it accepted the $100.00 credit. Whether plaintiff knew of the cracked pump and valve at the time of the agreement is

irrelevant. The parties agreed that the $100.00 credit was for storm damage. The pump/valve damage was not caused by improper mooring during the storm but, rather, by freezing.

A bailment existed between the parties when the pump and valve damage occurred. Plaintiff tendered the RIP VAN WINKLE's keys upon arrival at the dry dock. Plaintiff did not have unrestricted access to the vessel. The dry dock was securely locked at night and on holidays to the exclusion of plaintiff. Therefore, the vessel was within defendant's exclusive possession from the time of delivery until the vessel was afloat. A bailment existed during that time span. *See Commercial Union Ins. Co. v. Bohemia River Associates, Ltd.,* 855 F.Supp. 802, 805 (D.Md.1991) ("a contract for the storage or repair of a boat constitutes a bailment agreement").

Since plaintiff/bailor delivered the vessel to defendant/bailee with pump and valve intact, the burden lies with defendant to show due care. *Hicks v. Tolchester Marina, Inc.,* 1983 WL 709, at *2 (D.Md. Sept. 6, 1983). Defendant has not met its burden. Consequently, defendant is liable for the damage to the pump and valve. Plaintiff is entitled to $529.65 in compensatory damages.

## II. CONCLUSIONS OF LAW

### A. Breach of Contract

The parties herein entered into a binding executory oral agreement. A meeting of the minds took place as to the essential elements requisite to formation. Restatement (Second) of Contracts § 17 (1979).

Many terms of the agreement, particularly the billing terms, were found to be ambiguous. Where the court encountered ambiguity industry practice and custom were called upon so that a reasonable term could be supplied. Restatement (Second) of Contracts § 204 (1979). In this manner, each parties' duties and obligations were determined.

The court finds that defendant breached its contract with plaintiff by overcharging the latter for repairs. A total of $5,956.00 in overcharges were billed to plaintiff. These

overcharges resulted from defendant's improper billing for subcontractor's time, lay days and sandblasting. The overcharges are substantial. Plaintiff is entitled to $5,956.00 in damages for its loss of the benefit of the bargain.

### B. Breach of the Implied Warranty of Workmanlike Performance

■ "Every maritime service contract contains an implied warranty of workmanlike performance." *Selame Associates, Inc. v. Holiday Inns, Inc.*, 451 F.Supp. 412, 419 (D.Mass.1978). "[A] warranty of workmanlike performance may be breached by non-negligent as well as by negligent conduct." *Fairmont Shipping Corp. v. Chevron Int'l Oil Co., Inc.*, 511 F.2d 1252, 1260 (2d Cir. 1975).

Defendant failed to apply the hull paint in a workmanlike manner. Paint was applied over rust bloom and under improper weather conditions. Defendant ignored drying time specifications and recommended application procedures.

Defendant's failure to apply the hull paint in a workmanlike manner constitutes a breach of the implied warranty of workmanlike performance. Plaintiff is entitled to $10,480.75 in damages for the cost of hauling, sandblasting and re-painting the RIP VAN WINKLE.

### C. Negligence

■ In Count III of its complaint, plaintiff alleges that defendant's unworkmanlike repairs amount to negligence. Defendant counters by citing a line of precedent that disallow negligence claims when the "damages suffered are of the type remediable in contract." *Messina v. Ocean Repair Service Co.*, 1991 A.M.C. 2553, 2557, 1991 WL 116336 (S.D.N.Y.1991) quoting *Carmania Corp., N.V. v. Hambrecht Terrell Int'l*, 705 F.Supp. 936, 938 (S.D.N.Y.1989). The court agrees with defendant that plaintiff's breach of contract/warranty claim provides the proper form of relief to the exclusion of plaintiff's tort claim. Plaintiff has failed to present any tortious conduct on the part of defendant that exists independent of the parties' agreement.

The Supreme Court in *East River Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), held that in a products liability claim against a manufacturer where the only injury is economic loss, contract/warranty theory, not negligence, provides the rule of law. The opinion was expanded by the Fifth Circuit in *Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752 (5th Cir. 1989), to encompass service contracts. In *Employers* the court stated:

> [w]hether the negligence alleged is in the performance of a contract for services, or in a contract for the sale of goods, the resulting economic loss "is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law."

866 F.2d at 765, quoting *East River*, 476 U.S. at 870, 106 S.Ct. at 2302. The Southern District of New York in *Messina v. Ocean Repair Service Co.*, *supra*, agreed with the Fifth Circuit's analysis. In *Messina* the plaintiff espoused a negligence claim based on damage to its vessel's engine due to defendants' faulty inspection/servicing. The court precluded the negligence claim, citing to the *East River* opinion. The court found that the "economic loss rule" adopted by *East River* applies equally as well in the services context as in the products liability context. *Messina v. Ocean Repair Service Co.*, 1991 A.M.C. at 2558.

The "economic loss rule" applies in this case. The parties' relationship is governed by a service contract. "In a commercial context ... parties are generally capable of allocating the risk of defective performance of a contract for services." *Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d at 765. Therefore, the relief afforded plaintiff under contract/warranty law is sufficient. Plaintiff's negligence claim is precluded.

### D. Punitive Damages

■ "Punitive damages are appropriate in maritime tort actions where defendant's actions were intentional, deliberate, or so wanton and reckless as to demonstrate a

conscious disregard for the rights of others." *Delta Marine, Inc. v. Whaley,* 813 F.Supp. 414, 416–17 (E.D.N.C.1993). Punitive damages are not recoverable for breach of contract unless a tort claim, in which punitives are recoverable, arises independent of the breach. Restatement (Second) of Contracts § 355 (1979). "This rule applies although the breach is intentional or even when it has been effected with malicious intent." *Thyssen, Inc. v. S.S. Fortune Star,* 777 F.2d 57, 63 (2d Cir.1985).

Plaintiff has not presented the court with a separate and distinct tort claim that can survive independent of the breach of contract/warranty. *See Leather's Best Int'l, Inc. v. M.V. "LLOYD SERGIPE",* 760 F.Supp. 301, 313–14 (S.D.N.Y.1991) (no punitive damages where the defendant's liability was grounded in breach of contract). Accordingly, plaintiff is not entitled to an award of punitive damages.

### E. *Connecticut Unfair Trade Practices Act (CUTPA)*

■ Connecticut General Statute § 42–110b(a) states "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Plaintiff claims that defendant violated CUTPA by: 1) failing to provide qualified welders; 2) misrepresenting that it had sufficient manpower to perform repairs; 3) failing to advise of the need to subcontract; 4) misrepresenting, via an advertisement, that it could provide complete boat servicing; 5) misrepresenting the durability of the paint job; 6) misrepresenting that the final invoice was negotiable; and 7) overcharging.

Plaintiff's allegations are without merit in light of the following factual findings: 1) defendant's welders were qualified; 2) defendant possessed sufficient manpower to undertake most of the repairs initially required; 3) before the actual dry dock the need for extensive steel repair was not realized, thus defendant had no duty to disclose that welding subcontractors would be necessary; 4) defendant's advertisements contained no substantive misrepresentations; 5) no five year paint guarantee was communicated to plain-

tiff; and 6) defendant negotiated in good faith by offering to haul the RIP VAN WINKLE free of charge for inspection.

■ Plaintiff's final claim of overcharging does not rise to a level of unfairness sufficient to constitute a CUTPA violation. To determine whether conduct is unfair, the court must consider the following three criteria:

> "(1) whether the practice ... offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers."

*Conaway v. Prestia,* 191 Conn. 484, 492–93, 464 A.2d 847 (1983) quoting *FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244 n. 5, 92 S.Ct. 898, 905 n. 5, 31 L.Ed.2d 170 (1972).

Due to the ambiguity of the parties' contract, defendant's conduct was not immoral, unethical, oppressive or unscrupulous. The parties agreed to certain billing rates but did not determine how some of the rates would be applied. A majority of the overcharges resulted from discrepancies over the application of rates. Additionally, most of the overcharges occurred due to defendant's subcontractor's faulty billing practices.

The overcharges did not injure plaintiff or offend public policy to the extent that a CUTPA violation is justified.

For the foregoing reasons, plaintiff's CUTPA claim is precluded.

### F. *Loss of Use*

■ In Count VI of its complaint, plaintiff prays for an award of lost earnings. Plaintiff alleges that its agreement with defendant identified October 30, 1989 as the date the RIP VAN WINKLE would be dry docked. The last week of plaintiff's tour business was cancelled in order that the vessel arrive at the dry dock by October 30. Defendant was not able to haul the vessel into dry dock until November 20, 1989.

The court disagrees with plaintiff that the parties' contract was firm as to the October 30, 1989 dry docking date. The dry docking date was tentative. October 30 was merely the date when defendant could expect the vessel to arrive at the dry dock.

Plaintiff had its own incentive to deliver the vessel to defendant on October 30 regardless of whether it would be immediately dry docked. Plaintiff hoped to undertake repairs and receive Coast Guard certification quickly so that the vessel could steam back to its New York mooring before the icing of the Hudson. Plaintiff made a business decision to cut short its tour season by one week to allow work to begin as soon after the delivery date as possible. Plaintiff's loss of use/earnings claim is precluded.

## CONCLUSION

For the foregoing reasons, judgment shall enter in favor of plaintiff on Counts I and II of its complaint in the amount of $16,966.40. Judgment shall enter in favor of defendant on Counts III, IV, V and VI.

## RULING ON PLAINTIFF'S MOTION FOR PREJUDGMENT INTEREST

On November 7, 1994 a ruling was issued on the merits in this maritime contract dispute. Plaintiff was awarded $16,966.40 in damages on Counts I (Breach of Contract) and II (Breach of Warranty) of its complaint. The award consisted of $6,485.65 for contract overcharges and $10,480.75 to reimburse for an unworkmanlike paint job on the hull of plaintiff's vessel. Judgment was entered by the clerk of the court on November 30, 1994. At issue is plaintiff's claim for prejudgment interest on the damage award.

## DISCUSSION

■ Under the law of admiralty prejudgment interest should be awarded unless the court is presented with extraordinary circumstances. *Mitsui & Co., Ltd. v. American Export Lines, Inc.*, 636 F.2d 807, 823 (2d Cir.1981). Extraordinary circumstances exist "only when the district court concludes that the party requesting interest has (1)

unreasonably delayed in prosecuting its claim, (2) made a bad faith estimate of its damages that precluded settlement, or (3) not sustained any actual damages." *Matter of Bankers Trust Co.*, 658 F.2d 103, 108 (3rd Cir.1981).

■ Defendant contends that due to plaintiff's request for relief in the amount of $347,500.00, plaintiff's actual recovery of only $16,996.40 and defendant's settlement offer of $18,000.00, plaintiff proceeded to trial in bad faith and a prejudgment interest award should be precluded. The court disagrees. Plaintiff presented a legitimate dispute which was closely contested at trial. The court finds that plaintiff proceeded in a good faith effort to secure recovery. A prejudgment interest award is appropriate.

■ A district court has broad discretion to determine when prejudgment interest commences and what rate of interest to apply. *Indep. Bulk Transp., Inc. v. The Vessel "Morania Abaco"*, 676 F.2d 23, 25 (2d Cir. 1982). An interest award should "reimburse the claimant for the loss of use of its ... funds from the time of such loss until judgment is entered." *Matter of Bankers Trust Co.*, 658 F.2d at 108.

When plaintiff paid defendant's invoice for services rendered on December 21, 1989, the latter received a windfall of $6,485.65 due to contract overcharges. Consequently, plaintiff sustained loss of use of the $6,485.65 from December 21, 1989 through November 30, 1994 (i.e., the date judgment was entered). Additionally, plaintiff was required to pay third party repair service Feeney Drydock $10,480.75 for hull repainting due to defendant's unworkmanlike paint job. Plaintiff sustained loss of use of the $10,480.75 from the date the funds were paid to Feeney's Drydock through judgment, i.e., December 12, 1990 through November 30, 1994.

■ A "[p]laintiff is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations." *Indep. Bulk Transp., Inc. v. The Vessel "Morania Abaco"*, 676 F.2d at 27. In the case at hand, the court finds that the yield on six-month Treasury Bills is the most appro-

priate gauge by which to award plaintiff prejudgment interest. *See, e.g., McCrann v. United States Lines, Inc.,* 803 F.2d 771, 774 (2d Cir.1986) (prejudgment interest award based on average interest rate paid on six-month Treasury Bills); *New England Petroleum Co. v. O.T. Sonja,* 732 F.Supp. 1276, 1286 (S.D.N.Y.1990) (same). Since the yield on six-month Treasury Bills often fluctuates, the average rate for the pertinent time period will be used. *See Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d 293, 311 (2d Cir.1987) (due to fluctuations in Treasury Bill interest rate over relevant time period, equity advised the use of the average rate for the period). Plaintiff is entitled to a prejudgment interest rate of 4.7% on the $6,485.65 award and 4.2% on the $10,480.75 award, to be compounded annually. *See Mentor Ins. Co. Ltd. v. Brannkasse,* 996 F.2d 506, 520 (2d Cir.1993) (falls within district court's discretion to compound a prejudgment interest award).

The $6,485.65 award compounded annually at 4.7% per year from December 21, 1989 through November 30, 1994 comes to $1,653.42 in prejudgment interest. The $10,-480.75 award compounded annually at 4.2% per year from December 12, 1990 through November 30, 1994 comes to $1,856.27 in prejudgment interest.

### CONCLUSION

For the foregoing reasons, the judgment entered on November 30, 1994 shall be amended to include a prejudgment interest award of $3,509.69.