**VANCOR STEAMSHIP CORP.**

v.

**UNITED STATES.**

**C.D. 4627, Court No. 69/6257–531.**

United States Customs Court.

Jan. 9, 1976.

Hill, Betts & Nash, New York City (Robert W. Mullen, New York City, of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen. (John N. Politis, trial attorney, New York City), for defendant.

MALETZ, Judge:

■ This action involves the dutiable status of the forebody of a French tank vessel known as the Isanda. The forebody was towed across the Atlantic Ocean from Le Havre, France to Mobile, Alabama where it was entered in April 1968. Thereafter, it was classified by Customs as a floating structure under item 696.60 of the tariff schedules, as modified by T.D. 68–9 and assessed duty at the rate of 17 percent ad valorem. Plaintiff claims that the forebody was a vessel within the meaning of section 401(a) of the Tariff Act of 1930, as amended (19 U.S.C. 1401(a)) and hence entitled to duty-free entry by virtue of general headnote 5(e) of the tariff schedules.

The pertinent statutory provisions provide as follows:

Classified under [Schedule 6, part 6, subpart D]:
Subpart D headnote:

1. This subpart does not cover—

\* \* \* \* \* \*

(ii) vessels which are not yachts or pleasure boats (see general headnote 5(e)).

\* \* \* \* \* \*

696.60 Buoys, beacons, landing stages, cofferdams, rafts, and oth-

er floating structures (except vessels) ................. 17% ad val.

Claimed under [GENERAL HEADNOTES AND RULES OF INTERPRETATION]:

5. Intangibles. For the purposes of headnote 1—

\* \* \* \* \* \*

(e) vessels which are not "yachts or pleasure boats" within the purview of subpart D, part 6, of schedule 6,

are not articles subject to the provisions of these schedules.

Section 401(a) of the Tariff Act of 1930, as amended (19 U.S.C. 1401(a)):

(a) The word "vessel" includes every description of water craft or other contrivance used, or capable of being used, as a means of transportation in water, but does not include aircraft.

The facts are as follows: The French vessel Isanda was a 635 foot self-propelled oil tanker with a capacity of about 32,000 tons deadweight that was built in 1955 and was used during the next decade for the carriage of oil and other petroleum products. In 1967, the owners of the Isanda decided to "jumboize" the Isanda, i. e., increase the freight carrying part of the vessel, which was done by removing the entire stern section, including the engines, and joining to that section the larger forebody of another tanker thereby enlarging the Isanda's capacity from 32,000 tons deadweight to 60,000 tons.[1]

After removal of the stern section of the Isanda, there was left a forebody

---

1. In a self-propelled vessel the power plant package at the stern is not only the most significant portion of the total cost of the craft, it constitutes the heart of the vessel. Thus, when one wishes to jumboize a vessel, the identity of the jumboized vessel is represented by that portion of the original vessel containing the power package. The reasons for jumboization of tankers, particularly in the post World War II period, were explained by a witness as follows (R. 258): "The T–2 tanker, a wartime construction, had a relatively high powered character in comparison to the total size of the vessel. In the postwar period, these T–2 tankers which were, at the time of their original conception considered to be large, fast tankers, really turned out to be small fast tankers and, consequently, not nearly so economically competitive as the larger vessels that were being built in that postwar period. It was conceded, therefore, that if one were to take the existing power package of that vessel \* \* \* [attach] this then to a new fabrication to make a larger carrying capacity, one would lose very little in the way of vessel speed, one would increase handsomely in productivity of the vessel at relatively small cost. And, consequently, this led to the jumboizing practice that saw so many of these T–2's enlarged by a factor of two and sometimes more." See also Todd Shipyards Corporation v. United States, 63 Cust.Ct. 165, 168, n. 4, C.D. 3891 (1969).

about 497 feet in length and 84 feet in breadth which was purchased by plaintiff, Vancor, in August 1967 for the sum of $400,000. A few days later, plaintiff purchased for $600,000 a T–2 American flag tanker, the Westfield, which was 525 feet in length and had a capacity of 16,500 tons deadweight. Plaintiff's intent in purchasing the Westfield and the former forebody of the Isanda was to jumboize the Westfield by joining the forebody to the stern section of the Westfield thereby enlarging the Westfield's length from 525 feet to 825 feet and its capacity from 16,500 tons deadweight to 34,000 tons.

To carry out this project, the former forebody of the Isanda was towed by tug across the Atlantic from Le Havre to a shipyard in Mobile where the Westfield was berthed. At that yard the stern portion of the Westfield was removed and joined to the former forebody of the Isanda. This joinder, as explained by the naval architect who supervised the project, was accomplished in the following manner (R. 128–9): "[w]hen the Isanda was towed to the Gulf, it was cut midway in the last number 10 tank, and we fabricated a new section from that point to the beginning of the aft-most bulkhead, or the aft-most bulkhead, had it been there. We constructed a half tank, and designed it in such a manner that we could make a transition between the wide beam of the Isanda and the narrow beam or breadth of the American ship, the T–2." More particularly, a transition piece of about 30 feet from fore to aft was constructed to connect the forebody of the Isanda with the stern section of the Westfield. A further part of the work consisted of removing the extreme lower portion of the

bow of the Westfield—which was cylindrical in shape and weighed about 10 tons—and fastening it to the lower portion of the bow of the former forebody of the Isanda. This modification, while not necessary from a nautical standpoint, was effected to improve the speed performance of the jumboized tanker, i. e., the Westfield.[2] Eventually that tanker was called the Vantage Horizon and it continues to sail as a vessel to this day, carrying cargoes under the American flag.

When the former forebody of the Isanda was towed across the Atlantic to Mobile, it carried neither cargo nor crew and had the following characteristics among others: The centre bridge had been removed which deprived the forebody of any controlling or steering device. Its hull was in satisfactory condition. It had navigating lights but no power facilities making it necessary to power the lights by batteries or kerosene. It lacked any type of safety equipment and its aft bulkhead was open to the sea. Also it lacked many items such as mooring winches and lines, valves, piping and deck fittings—all of which had been removed prior to the crossing. The interior structure and the web frames of the wing tanks were in good condition and two pumps remained in the forward pump room. However, reach rods and pedestals had been removed from that room so that the pumps could not be operated. Further, the forebody had two masts which were in fair condition, a complete set of heating coils, a clean dry cargo hold, steel work in good condition, and tanks which were very clean and gas free. Finally, the record shows that the forebody as it crossed the ocean on its voyage to Mobile

---

2. As testified by the naval architect who supervised the project (R. 175, 177): "The work we did involved the jumboizing of the Westfield. In other words, the Westfield, as it was originally constructed, had a capacity of approximately 16,000 tons of cargo. When we removed the original forward portion of the Westfield and we installed the Isanda portion, the capacity of the vessel was now in the neighborhood of 34,000 * * * [dead] weight tons. That is why we refer to the process as 'jumboizing.' We made the Westfield larger. * * * [T]he forebody as we have been referring to it today, is called the Isanda and no where * * * [did] we ever make that portion of the vessel larger. The vessel that we increase[d] the capacity of and made larger was the Westfield. We jumboized the Westfield and made the Westfield larger."

was capable of carrying only a limited amount of cargo because of its generally poor condition.

During the crossing, the forebody was under a marine hull and machinery insurance cover and prior thereto underwent a Lloyd's survey by a surveyor of Bureau Veritas, a world-wide marine insurance classification society. The marine insurance premium was $32,500.

When the forebody arrived at the entrance of the harbor at Mobile, it was joined by a riding crew of five seamen and charged pilotage. The riding crew served aboard from 8:00 A.M. to 6:00 P.M. on November 17, 1967 and performed the duties of opening tank tops and handling the mooring of the forebody. At Mobile plaintiff Vancor was represented by a ship's agent, Strachan Shipping Co. The transatlantic tow cost plaintiff $65,000.

Against this factual background it must be concluded that the forebody was not a "vessel" but rather a floating structure, as classified by Customs, and hence that plaintiff's claim must be dismissed. Dispositive in the court's view is *United States v. Bethlehem Steel Co. et al.*, 53 CCPA 142, C.A.D. 891 (1966),[3] *cert. den.*, 386 U.S. 912, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967), *reh. den.*, 386 U.S. 987, 87 S.Ct. 1284, 18 L.Ed.2d 241 (1967) which held that certain midbodies that were towed across the Atlantic to the United States were not vessels and hence not entitled to duty-free status.[4] The evidence with respect to the midbodies was set forth by this court in the following summary (54 Cust.Ct. at 3–4, 238 F.Supp. 483) which was adopted by the appellate court (53 CCPA at 143):

It appears from the evidence that the midbodies in controversy were constructed in European shipyards in accordance with conventional designs, plans, and specifications prepared by naval architects which conformed to the accepted standards in the construction of watercraft generally and approved by governing bodies, such as the American Bureau of Shipping, the United States Coast Guard, and the United States Public Health Service.

The midbodies were over 500 feet in length and had a cargo capacity of between 12,000 and 14,000 tons. In order to facilitate their transatlantic voyage, they were equipped with a temporary bow and additional stiffeners were used to strengthen the stern. Furthermore, each craft had sleeping accommodations for a crew of eight men, each of whom had signed ships' papers for the crossing. They were equipped with light, heat, power, food, radio facilities, and navigational lights and signals in order to comply with navigational rules of the road and to indicate that the craft were under tow, as required by law for vessels only. * * *

Upon their arrival in this country, the midbodies were suitable for use as vessels of the barge type for commercial use in the transportation of cargo. They were designed for ultimate use as cargo sections of self-propelled ore carriers on the Great Lakes.

The evidence also discloses that each craft carried marine insurance * * which was secured for protection against damage or loss of the craft in transit and which also served as coverage for the crew of eight who manned the craft while crossing the ocean. In addition to the foregoing, the midbodies were equipped with liferafts, life preservers, anchor and chain, and a generator for light, heat, and messing.

In this setting, the appellate court stated (53 CCPA at 152):

---

3. Petition for rehearing denied October 6, 1966.

4. In the *Bethlehem* case the appellate court reversed the decision of this court holding that the midbodies were "vessels." *Bethlehem Steel Company et al. v. United States*, 54

Cust.Ct. 1, C.D. 2500, 238 F.Supp. 483 (1964). The decision of the appellate court in *Bethlehem* was followed by this court in *Todd Shipyards Corporation v. United States, supra*, 63 Cust.Ct. 165.

* * * There is no evidence Congress intended, as appellant states, that "any floating object which has the capacity to carry merchandise must be accorded duty-free status." Second, that the midbodies are "staunch seagoing" structures does not establish that they are vessels. Rather, in all the cases cited, each of the "inferior craft" was capable of and designed to perform a sufficiently related function to "means of transportation" on water to qualify as a vessel. The liberality expressed in the law in interpreting the term "vessel" goes to the very fact that size and structure per se does not determine that a structure is a vessel.

The midbodies, at the time of importation, were not "barges" or equivalent to a barge as appellees would have us hold. They were precisely what the evidence shows, a midsection for a vessel. They were complete in nearly every respect, as pointed out supra. In order to tow them across the ocean they were fitted with temporary, sturdy fore and aft sections.

All of the evidence of record establishes that the midsections, at the time of importation, were not watercraft designed or intended as a means of transportation on water. Their sole resemblance to craft that have been held to be vessels (barges) and their qualification under a literal reading of the definitions advanced as vessels stems from the fact that temporary fore and aft sections were constructed for the tow across the ocean *to make possible their designed and intended use as midsections and not means of transportation.* We find our conclusion that the midbodies are not vessels is consistent with all of the cases discussed below and relied upon by appellees. [Emphasis in original.]

Continuing, the court observed that the midbodies made the trip across the ocean "for the exclusive purpose, and were designed and intended for no other reason than to serve as midsections of ore carriers. Thus considered, the midbodies were not vessels at the time of importation, * * * ." *Id.* at 153. Similarly, the present record establishes that the forebody made the trip across the ocean for the exclusive purpose, and was intended for no other reason than to be used in the rebuilding of an American flag vessel, i. e., the Westfield. What is more, if a comparison were to be made between the forebody in the present case and the midbodies in *Bethlehem*, the midbodies would be more like vessels than the forebody, considering that the midbodies carried a crew, had power facilities on board and were capable of carrying cargo, whereas the forebody had no crew, no power on board, and was capable of carrying only a limited amount of cargo because of its generally poor condition.

Plaintiff argues, however, that the present case is distinguishable from *Bethlehem* on the basis that the forebody "was born a vessel whereas the Bethlehem midbodies never achieved that status." (Br. p. 15.) However, this argument overlooks the fact that it was the condition of the forebody when it was imported that determines its status for tariff purposes and not its status at a prior stage before it was severed from the Isanda. And in its condition as imported the forebody—like the *Bethlehem* midbodies—had but one purpose—to be used as material for the jumboization of an American vessel and not as a means of transportation on water. To paraphrase what the appellate court said in *Bethlehem* (53 CCPA at 152), all the evidence of record establishes that the forebody at the time of importation was not watercraft intended as a means of transportation on water.

■ On another aspect, plaintiff points out that the forebodies of two French sister ships of the Isanda, the Isidora and Isara—which were intended to be used in the same way as the forebody of the Isanda, namely to jumboize American flag tankers—were entered at the port of Beaumont on March 11, 1966

and July 31, 1966, respectively, and were classified by Customs as "vessels" and thus exempt from duty. Plaintiff argues that since Customs at Beaumont treated these two forebodies as vessels and collected no duty, the action of Customs at Mobile in treating the virtually identical forebody of the Isanda involved here as a floating structure and imposing a duty of 17 percent ad valorem violated section 8 of the Constitution which specifies that "all Duties, Imposts and Excises shall be uniform throughout the United States."

With respect to this argument, it is to be noted that at the time the forebodies of the Isidora and Isara were entered at Beaumont, i. e., on March 11, 1966 and July 31, 1966, and exempted from duty by Customs on the basis that they were "vessels," an appeal by the government was pending from the decision of this court in *Bethlehem Steel Company et al. v. United States, supra,* 54 Cust.Ct. 1, 238 F.Supp. 483, holding that the midbodies in question were "vessels" and thus duty-free. The facts, as set out in defendant's exhibit B, show that after the decision of the appellate court in *Bethlehem* in August 1966 reversing the trial court decision and holding the midbodies to be dutiable, the Bureau of Customs reconsidered its previous decision as to the tariff status of the forebodies of the Isidora and Isara and initiated various steps—which are detailed in the above exhibit—to collect duties on these two forebodies. However, as indicated in defendant's exhibit B, efforts by Customs to collect these duties have thus far been frustrated due to an apparent disagreement as to the ownership of the forebodies at the time they were imported into the United States.

In the present case, the basis for assessing duties on the forebody of the Isanda was that it was in conformance with the law as set forth by the appellate court in the *Bethlehem* case. Indeed, had Customs not assessed duties on the present forebody, such an omission would have been contrary to the law. From the standpoint of hindsight it might be argued that Customs' failure initially to assess duties on the forebodies of the Isidora and Isara was erroneous, but this cannot serve to relieve this plaintiff of its obligation to pay the duties legally due. Certainly, errors of judgment on the part of government officials or the clever use of corporate law by the owners of those two forebodies cannot now be used to defeat the legal requirement that the imported merchandise here involved be dutiable. Even an improper failure to collect duties on one occasion is scarcely a legal basis for refusing to collect duties clearly due on another occasion absent the applicability of the established and uniform practice doctrine, which has not been urged here and is clearly not applicable.[5]

Finally, plaintiff argues that Customs' failure to treat the forebody of the Isanda as a vessel is inconsistent with its treatment as a vessel of the forebody of the Stolt Dagali. The facts concerning this matter are as follows: In November 1964 the Stolt Dagali, a Norwegian vessel, collided in the Atlantic with another vessel causing the severance and sinking of the Stolt Dagali's stern section. The forebody of the Stolt Dagali remained intact and was towed into the port of New York where its cargo was unladen, after which it was towed back across the Atlantic to Europe. Customs treated the forebody as a vessel and thus allowed

---

5. The established and uniform practice doctrine is covered by 19 U.S.C. 1315(d) which provides as follows:

(d) No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; but this provision shall not apply with respect to the imposition of antidumping duties.

entry duty-free. Plaintiff claims that since no duty was assessed on that forebody no duty should have been assessed on the forebody of the Isanda. But there is a major difference between the status of the forebody here in issue and the forebody of the Stolt Dagali. For the forebody at bar was imported into the United States for the sole purpose of being used as material for the jumboization of an American vessel, whereas the forebody of the Stoldt Dagali was brought into the United States solely as a means of transportation, i. e., to discharge its cargo and return to its country of origin for rework into another vessel.

For the reasons stated, it is concluded that the forebody at bar was properly classified by Customs as a floating structure under item 696.60. Therefore plaintiff's claim is overruled and judgment will be entered accordingly.