**ELIZABETH RIVER TERMINALS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 75–10–02534.**

United States Court of International Trade.

Feb. 26, 1981.

518

Vandeventer, Black, Meredith & Martin, Norfolk, Va. (G. W. Birkhead, Norfolk, Va., at the trial and on the briefs), for plaintiff.

Thomas S. Martin, Acting Asst. Atty. Gen., Washington, D. C.; Joseph I. Liebman, New York City, Atty. in Charge, International Trade Field Office, Commercial Litigation Branch (Madeline B. Kuflik, New York City, at the trial and on the brief), for defendant.

RE, Chief Judge:

In this action, plaintiff sues to recover duties assessed on the cost of repairs made in a foreign country to its barge, the *Cambria*. The repairs, on which duties were assessed and which plaintiff seeks to have refunded, were made in Montreal, Quebec, Canada, in 1973.

Plaintiff, Elizabeth River Terminals, Inc., operates a dry bulk cargo facility. In its operation, plaintiff loads and unloads deep-water vessels, stores dry bulk materials and handles scrap metal for export.

The *Cambria* was purchased by the plaintiff on July 9, 1973 for use as a crane platform moored at its place of business in Norfolk, Virginia. Earlier, the *Cambria* was a self-propelled Great Lakes ore carrier. In 1968, it was dropped from classification as an ore carrier, and the engines were deactivated. From 1968 until its purchase by plaintiff, the *Cambria* was moored to the shore in Milwaukee, Wisconsin, and was used for loading, unloading and holding scrap.

After the plaintiff purchased the *Cambria*, it was towed from Milwaukee to Montreal for the purpose of making certain repairs. Some of the repairs were necessary for the sea portion of the tow, whereas others were made for its use in Norfolk, Virginia. In order to permit the voyage from Montreal to Norfolk, Virginia, the *Cambria* was registered by the United States Coast Guard. The *Cambria* was readmeasured as a barge, and Certificates of Registry and Inspection were issued by the United States Coast Guard. The Certificate of Inspection prohibited the carrying of cargo.

After the repairs were made in Montreal, the *Cambria* was towed to Norfolk, Virginia, where, pursuant to section 466(a) of the Tariff Act of 1930, as amended (19 U.S.C. § 1466(a)), duties were assessed on the cost of the foreign repairs. Section 466(a) of the statute provides for a duty of 50 per centum to be assessed on the cost of repairs made in a foreign port on a vessel documented under the laws of the United States to engage, or intended to be employed, in

foreign or coasting trade. Subsection (d) of section 466 (formerly subsection (b) and redesignated (d) by Pub.L. 95–410 (1978)), not in issue in this case, provides for a remission of duties for certain "necessary repairs," i. e., repairs "compelled, by stress of weather or other casualty." *See Suwannee Steamship Co. v. United States*, 79 Cust.Ct. 19, C.D. 4708, 435 F.Supp. 389 (1977). On January 5, 1971, subsection (e) (formerly subsection (c) and redesignated (e) by Pub.L. 95–410 (1978)) was added which provides for an exemption from duties for "any vessel designed and used primarily for purposes *other than* transporting passengers or property in the foreign or coasting trade" if certain specific criteria are met. (Emphasis added.)

Plaintiff does not dispute the amount of the duties assessed, but contends that, under this court's holding in *Corpus Co. v. United States*, 69 Cust.Ct. 170, 176, C.D. 4390, 350 F.Supp. 1397, 1402 (1972), *appeal dismissed*, 60 CCPA 185 (1973), "[w]here a vessel does not engage in trade, is not intended to engage in trade, and indeed is physically incapable of engaging in trade, its repairs are not dutiable under section 466."

Although a Certificate of Registry was issued, plaintiff nevertheless asserts that the *Cambria* was not used in the foreign or coasting trade, and was not intended for such use. Hence, it contends that the duties imposed by section 466(a) of the Tariff Act of 1930, as amended, do not apply. It adds that since the *Cambria* was used as a shore facility affixed to the pier in Milwaukee, and was intended to be affixed to the pier in Norfolk, clearly, it should be controlled by the decision in the *Corpus* case which dealt with vessels engaged exclusively in oceanographic research. Plaintiff states that "the CAMBRIA not only passes the *Corpus* test, but goes further [as] [t]he CAMBRIA was arguably not even a vessel, but a floating platform or derelict." Plaintiff claims that, as a crane platform, the *Cambria* is not dutiable under section 466 which is intended to include only documented vessels.

The defendant disagrees, and maintains that the duties were properly assessed upon the repairs performed in Montreal on a vessel documented under the laws of the United States. First, defendant maintains that the Congressional intent underlying section 466 is to assist and protect American shipyards and labor from the competition of foreign shipyards and that this is a long-standing policy with national defense implications. Second, defendant contends that with the addition of subsection (e) to section 466 in 1971, Congress made it clear that "any vessel designed and used primarily for purposes other than transporting passengers or property in the foreign or coasting trade," is subject to duties for foreign repairs unless the specific statutory criteria for exemption are met. Third, defendant contends that at the time the foreign repairs were performed upon the *Cambria*, it was a vessel documented under the laws of the United States to engage in foreign or coasting trade. It also contends that the fact documentation was required to transport the *Cambria* to Montreal for the purpose of repairs does not exempt the *Cambria* from the provisions of section 466(a). Defendant maintains that the action by the plaintiff, in transporting the barge to a foreign port for repairs to be performed in a foreign shipyard with foreign labor and materials, is equivalent to an intent to engage in foreign trade within the meaning of section 466(a) (19 U.S.C. § 1466(a)). Finally, defendant stresses that the *Corpus* decision interpreted and applied section 466 of the Tariff Act of 1930 as it read *prior to the 1971 amendment and the addition of subsection (e)*.

At the outset, plaintiff's claim depends upon whether the *Cambria* is a "vessel" within the intendment of 19 U.S.C. § 1466(a), and therefore subject to the customs duties for foreign repairs. Plaintiff indicates that if the *Cambria* is not a "vessel," it would not be subject to the imposition of duties, and plaintiff would be entitled to judgment in its favor.

The statutory definition of vessel, in the Tariff Act of 1930, as amended, is found in 19 U.S.C. § 1401, which provides that:

"(a) The word 'vessel' includes every description of water craft or other contrivance used, or capable of being used, as a means of transportation in water, but does not include aircraft."

It is also pertinent that the heading of section 3 of 1 U.S.C. (Rules of Construction) states the following:

" 'Vessel' as including all means of water transportation."

These provisions expressly state that "vessel" encompasses "every description of water craft or other contrivance *used, or capable of being used*, as a means of transportation in water," "including *all* means of water transportation." (Emphasis added.) Numerous cases have interpreted the meaning of the word "vessel." *See The Conqueror*, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897); *United States v. Seagull Marine*, 67 CCPA ——, C.A.D. 1251, 627 F.2d 1083 (1980). *See also Hitner Sons Co. v. United States*, 13 Ct.Cust.App. 216, T.D. 41175 (1925). *Cf. United States v. Bethlehem Steel Co.*, 53 CCPA 142, C.A.D. 891 (1966) (midbodies), *cert. denied*, 386 U.S. 912, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967); *Todd Shipyards Corp. v. United States*, 63 Cust.Ct. 165, C.D. 3891 (1969) (midbodies).

An examination of some early cases reveals that a barge without power of self-propulsion was held to be a "vessel," and therefore subject to the navigation laws. *Disbrow v. The Walsh Bros.*, 36 F. 607 (S.D. N.Y.1888). A similar holding is found in *The Old Natchez*, 9 F. 478 (C.C.S.D.Miss. 1881), in which an old dismantled hull of a river steamboat, being refitted for use as a wharf boat in loading passengers and merchandise, was held to be a "vessel."

In *Hitner Sons Co. v. United States*, 13 Ct.Cust.App. 216, T.D. 41175 (1925), a former Canadian armored cruiser was classified as manufactures of metal, and although originally designed and intended for use as a means of transportation in water, its substantial structural alteration rendered the design useless as a means of transportation in water. Hence it was held not to be a "vessel."

In the present case, the evidence offered by the plaintiff is that the *Cambria* had originally been used as an ore carrier and later as a barge used as a crane platform. It had undergone no major structural alterations as had the cruiser before the court in the *Hitner* case. Although there was testimony to the effect that the *Cambria* had been permanently moored at a scrap terminal, prior to plaintiff's purchase, the record leaves no doubt that it is a barge capable of being towed from its moorings in Milwaukee without any difficulty. The voyages undertaken clearly refute plaintiff's assertion of a "permanent" mooring. Regardless of any "permanent" mooring, the *Cambria* is a barge capable of being used as a means of transportation, and is therefore a vessel within the meaning of the pertinent provisions of law.

The authorities teach that the term "vessel" includes all types of watercraft or contrivance that can be used as a means of transportation in water. The test is not merely size and structure, or self-propulsion, but rather *capability and design* to serve as a means of transportation in water. In *United States v. Seagull Marine*, 67 CCPA ——, C.A.D. 1251, 627 F.2d 1083 (1980), which dealt with the duty-free treatment accorded "vessels" by the tariff laws, the Court of Customs and Patent Appeals recently expressed the following:

"As seen in 1 USC 3, supra, the definition of the term 'vessel' is quite broad. However, judicial precedent has limited the definition of 'vessel' for tariff purposes and has established that not every watercraft meeting the bare terms of the definition is entitled to entry into the United States duty-free. In particular, the scope of the term 'vessel' has been narrowed to limit duty-free treatment to watercraft that are *instrumentalities* of commerce as opposed to *articles* of commerce. [Citations omitted.]" (Emphasis in original.)

From the broad language of the pertinent statutes and the authorities examined, it is the determination of the court that the *Cambria*, when it entered into the port of

Norfolk, was a vessel within the meaning of the foreign repairs statute, 19 U.S.C. § 1466. It was documented under the laws of the United States, and was capable of being used as a means of transportation in water. Under the reasoning of the *Seagull Marine* case, it was an *instrumentality* of commerce rather than an *article* of commerce. There is no question that it had been designed and intended for use as a means of transportation in water. Furthermore, there is no evidence that it had undergone any major structural alterations to change this primary purpose or capability.

It is also pertinent that the Customs Regulations, contained in 19 C.F.R. § 4.0 preceding the provisions pertaining to Arrival and Entry of Vessels, read in part as follows:

> "(a) The word 'vessel' includes every description of watercraft or other contrivance used or capable of being used as a means of transportation on water, but does not include aircraft. (19 U.S.C. 1401.)
>
> "(b) The term 'vessel of the United States' means any vessel documented under the laws of the United States.
>
> "(c) The term 'documented' means registered, enrolled and licensed, or licensed by the U.S. Coast Guard."

Having concluded that the *Cambria* is a documented vessel within the intendment of 19 U.S.C. § 1466(a), the question presented is whether the repairs made on the *Cambria* in Montreal were properly subject to assessment of duties under the terms of the statute at the time that the repairs were made in 1973. The court has concluded that they were, and that the *Cambria* did not qualify for the exemption provided for in subsection (e).

In pertinent part, 19 U.S.C. § 1466(a) reads as follows:

> "§ 1466. Equipment and repairs of vessels
>
> (a) Vessels subject to duty; penalties
>
> The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the *expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States* to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country; * * *." (Emphasis added.)

Subsection (e) added on January 5, 1971, provides:

> "(e) Vessels used primarily for purposes other than transporting passengers or property in the foreign or coasting trade
>
> In the case of *any vessel designed and used primarily for purposes other than transporting passengers or property in the foreign or coasting trade* which arrives in a port of the United States two years or more after its last departure from a port of the United States, the duties imposed by this section shall apply only with respect to (1) fish nets and netting, and (2) other equipments, and parts thereof, and repair parts and materials purchased, or repairs made, during the first six months after the last departure of such vessel from a port of the United States." (Emphasis added.)

In summary, plaintiff invokes the doctrine of *stare decisis*, and contends that *Corpus Co. v. United States*, 69 Cust.Ct. 170, C.D. 4390, 350 F.Supp. 1397 (1972), is authority for the proposition that the *Cambria* is not subject to the assessment of duties pursuant to 19 U.S.C. § 1466(a).

The issue, as presented in the *Corpus* case, was whether foreign repairs on oceanographic research vessels documented to engage in foreign trade, but not capable of engaging in foreign trade, were properly subject to assessment of duties under the terms of section 466 of the Tariff Act of 1930, in effect *prior to* January 5, 1971. In *Corpus* the court decided that "[w]here a vessel does not engage in trade, is not intended to engage in trade, and indeed is physically incapable of engaging in trade,

its repairs are not dutiable under section 466." 69 Cust.Ct. at 176, 350 F.Supp. 1397.

In *Corpus*, the foreign repairs were made "during the period of 1966–1969," and the court expressly stated that duties had been imposed under section 466 of the Tariff Act of 1930 "in effect prior to January 5, 1971." *Id.* at 171, 350 F.Supp. 1397. Clearly, therefore, as indicated by the defendant, the decision in *Corpus* was an interpretation and application of the language of section 466 *before* the 1971 amendment. In *Corpus*, the court examined prior decisions, and concluded that the pertinent cases closely scrutinized the actual and intended use of the vessel in determining whether the cost of foreign repairs was dutiable under the statute prior to the 1971 amendment. Consequently, it cannot be asserted that *Corpus* is dispositive of the present case which involves foreign repairs made on the *Cambria* in 1973 after the enactment of subsection (e) to section 466 in 1971.

In the present case, the question presented centers on the interpretation and application of section 466 subsequent to the 1971 amendment by the addition of subsection (e) to the statute. Since the operative facts in *Corpus* occurred prior to the date of enactment of subsection (e) of the statute, and the meaning or effect of that subsection was not before the court, its holding is not *stare decisis* in the case at bar. *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 120, 179, 5 L.Ed. 257 (1821). As expressly stated in *Corpus*, and as indicated by defendant, the court interpreted and applied the ship repair statute as it existed *prior* to the addition of subsection (e). In the present case, the court must interpret and apply section 466 of the statute with the 1971 addition of subsection (e).

It cannot be denied that the court must interpret a statute in a manner that will carry out or effectuate the Congressional intent. *United States v. Gulf Oil Corp.*, 47 CCPA 32, 35, C.A.D. 725 (1959). In ascertaining Congressional intent, the court may refer to the legislative history of a statutory enactment, and need not limit its inquiry to a mere reading of the words of the statute. *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543–544, 60 S.Ct. 1059, 1063–1064, 84 L.Ed. 1345 (1940). *See Train v. Colorado*, 426 U.S. 1, 9–10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976). Clearly statutes are to be read *in pari materia*, and all subsections must be read in order to glean the legislative intent and animating purpose.

Subsection (a) of 19 U.S.C. § 1466 provides for the assessment of duties upon repairs made in foreign ports to vessels documented under the laws of the United States to engage, or intended to be employed, in the foreign or coasting trade. Subsection (e) provides, in material part, that for *vessels designed and primarily used for purposes other than transporting passengers or property in the foreign or coasting trade*, the duties imposed by section 1466(a) shall only apply to certain materials and repairs made within six months after departure from the United States, and when the vessels have not been in a United States port for two years or more. It is clear that subsection (a) provides for the assessment of duties, and subsection (e) provides for a limited exemption from the assessment under certain specific conditions.

The enactment of subsection (e) in 1971 was intended to relieve certain vessels from the duties imposed in subsection (a). The legislative history of the 1971 enactment (Pub.L. 91–654 (1971)) states the following:

### "EXPLANATION OF COMMITTEE AMENDMENT

"Present law requires the imposition of a 50-percent duty on the value of repairs made on, and equipment purchased for, U.S. vessels engaged in foreign trade, when such repairs or equipment were made or purchased in a foreign country. The House bill would have exempted shrimp vessels from this duty.

"The committee agrees with the House as to the desirability of this exemption but feels it *should be limited* to those instances where the vessel is abroad for extended periods of time and is not in need of repairs when it departs from this country.

"In addition, the committee agrees with a recommendation of the Treasury Department that the relief from tariffs provided by this bill should be extended to noncargo carrying 'special purpose' vessels.

\* \* \* \* \* \*

"This amendment is intended to relieve from a 50-percent ad valorem tax on the value of repairs made, and equipment purchased, in foreign countries, those American shrimp and other vessels which must be away from U.S. ports for extended periods of time and which during the course of that time must make normal repairs if they are to remain competitive with their foreign counterparts. The amendment would not· adversely affect American shipyards or American labor since *these vessels would have to be in foreign or international waters for 2 years or more in order to be relieved from payment of the duty*, and could not in any event be repaired in U.S. shipyards during their voyages. Besides shrimp boats, the amendment would apply only to 'special service vessels', such as *barges*, oil drilling vessels, oceanographic vessels, which, like shrimp boats, in the course of their operations, cannot return to U.S. ports to secure the necessary repairs, without great inconvenience." (Emphasis added.) S.Rep. No. 91–1474, 91st Cong., 2d Sess., *reprinted in* [1970] *U.S. Code Cong. & Ad.News* 5910–5911.

■ From the statutory language, as well as the legislative history, it is plain that Congress intended to exempt from duties only those foreign repairs made on special service vessels, such as barges, which meet the conditions set forth in 19 U.S.C. § 1466(e). Clearly, Congress entertained no doubt that "barges" are vessels within the meaning of the statute. Indeed, in the "Explanation of Committee Amendment," "barges" are expressly mentioned as illustrations or examples of "special service vessels."

In providing for the exemption, Congress manifested its understanding and intent that the special service vessels *were* subject to the duties imposed by section 1466(a); otherwise, there would have been no reason to amend section 466 of the Tariff Act of 1930 by including the exemption found in the present subsection (e).

The legislative history makes it clear that section 1466(e) was intended to relieve certain vessels from the duties imposed by section 1466(a), and that the newly granted relief was conditioned upon the prescribed prerequisites; i. e., that the repairs were made after the first six months of a vessel's voyage in foreign or international waters, and that the vessel's voyage in those waters last at least two years without the vessel returning to a United States port.

■ The *Cambria* was "an ore and steel carrier" which was later used as a barge upon which cranes were mounted. There is no doubt that the *Cambria* is a barge, and that it does not meet the specific conditions required by section 1466(e) for exemption from the foreign repair duties. Although it is used for purposes other than transporting passengers or property, it is nonetheless a "special service vessel" used as an instrumentality of commerce within the intendment of the statute. The functions of the *Cambria* were directly and solely related to the foreign and coasting trade. It served the operations of the plaintiff by the use of its cranes to load and unload cargo from deepwater vessels, and by the storing of dry bulk material and scrap for export.

It cannot be questioned that by virtue of its Certificate of Registry the *Cambria* was a vessel documented under the laws of the United States to engage in the foreign or coasting trade. As a seagoing barge, it was issued a Certificate of Registry and was required to be inspected by the Coast Guard. It is also significant that as a documented vessel it enjoyed the protection of the laws of the United States.

To accept plaintiff's interpretation of section 1466 would mean that, in 1971, by enacting subsection (e), Congress enacted a subsection which, for special service vessels, either repeated or contradicted subsection (a) since, according to plaintiff's reading of

the statute, special service vessels like the *Cambria* were not and are not subject to the duties provided for in subsection (a). Such a meaning would do violence to the basic principle of statutory interpretation and application that a court should give effect to all provisions of a statute. It cannot adopt a meaning which would render a section or subdivision of a statute a mere redundancy. *See Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307–308, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961). Moreover, as stated by the United States Court of Customs and Patent Appeals, in construing different parts of a tariff act which appear to be in conflict it is the court's function to harmonize them so as to give each of them meaning, and achieve a result which was reasonably within the legislature's contemplation. *Beaver Products Co., Inc. v. United States*, 17 CCPA 434, T.D. 43878 (1930); *accord, United States v. Corning Glass Works*, 66 CCPA 25, C.A.D. 1216, 586 F.2d 822 (1978); *see also Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 631, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973). By interpreting 19 U.S.C. § 1466(a) and (e) so that special service vessels are subject to the duties provided for in subsection (a) unless they meet the specific conditions set forth in subsection (e), the court is implementing the stated Congressional intent, and also avoids any conflict between the two subsections of the statute.

It is argued that the interpretation suggested by defendant, and accepted by the court, imposes an unnecessary hardship upon certain vessels. The question, however, is one of legislative policy. It is within the prerogative of the Congress to determine whether vessels are to be subject to the imposition of foreign repair duties, and under what circumstances those duties are not to be imposed or remitted. *See Erie Navigation Co. v. United States*, 83 Cust.Ct. 47, C.D. 4820, 475 F.Supp. 160 (1979).

The legislative history of 1466(a) and (e) indicates clearly that Congress intended the exemption from duties contained in subsection (e) to be limited, and that Congress intended and understood that barges were subject to the imposition of duties prescribed by subsection (a) as modified or limited by the specific provisions of subsection (e). On the evidence presented the *Cambria* did not qualify for the exemption provided for in 19 U.S.C. § 1466(e) from the assessment of the duties imposed pursuant to the provisions of 19 U.S.C. § 1466(a).

In view of the foregoing, it is the determination of the court that the *Cambria* was properly subject to duties for vessel repairs made in a foreign country pursuant to 19 U.S.C. § 1466(a). Since the duties at issue were properly assessed, plaintiff's action for their recovery must fail.

Judgment will issue accordingly.