**TODD SHIPYARDS CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 83–12–01754.**

United States Court of International Trade.

Sept. 20, 1985.

Haight, Gardner, Poor & Havens (James J. Sentner, Jr.), Houston, Tex., for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Judith M. Barzilay, Civil Div., U.S. Dept. of Justice, New York City, for defendant.

### OPINION AND ORDER

RESTANI, Judge:

This action involves the proper classification of a large floating drydock (the Big "T") exported from Japan and entered at the port of Houston, Texas, on February 25, 1982. The entry was classified by the United States Customs Service (Customs) under item 696.50 of the Tariff Schedules of the United States (TSUS) which encompasses "floating docks and parts thereof" and was liquidated and assessed duty at $1,034,411 (4.5% *ad valorem*). Plaintiff, Todd Shipyards Corporation, claims the merchandise is properly classified as a vessel within the meaning of general headnote 5(e) of the TSUS (1982) and should therefore enter the country free of duty. Plaintiff has met the jurisdictional requirements for relief in this court under 28 U.S.C. §§ 1581(a) and 2631(a) (1982). Defendant moves and plaintiff cross-moves for summary judgment pursuant to Court of International Trade Rule 56. Both parties agree that there are no genuine issues of material fact in dispute and that this matter is ripe for decision.

For purposes of the customs laws, the term "vessel" is defined in 19 U.S.C. § 1401 (1982), which provides:

(a) The word "vessel" includes every description of water craft or other contrivance used, or capable of being used, as a means of transportation in water, but does not include aircraft.

This definition is also found at 1 U.S.C. § 3 (1982), entitled "'Vessel' as including all means of water transportation," which is part of the rules of construction of the United States Code. Part 6, subpart D of schedule 6 of the TSUS (1982), which applies to "Pleasure boat; Floating Structure," mentions the word "vessels." The headnote to that subpart provides:

1. This subpart does not cover—

(i) yachts or pleasure boats provided for in items 696.05–.10 if in use or intended to be used in trade or commerce, or if brought into the United States by non-residents thereof for their own use in pleasure cruising; or
(ii) *vessels* which are not yachts or pleasure boats (see general headnote 5(e)) [emphasis added].

General headnote 5(e) provides:

5. *Intangibles.* For the purposes of headnote 1—[1]

\*     \*     \*     \*     \*     \*

(e) vessels which are not "yachts or pleasure boats" within the purview of subpart D, part 6, of schedule 6, are not articles subject to the provisions of these schedules.

TSUS, general headnote 5(e) (1982). Therefore, if the Big "T" is a vessel it cannot be classified and found dutiable under part 6, subpart D of schedule 6 as a "floating dock."

The undisputed facts in this case reveal that: The Big "T" is a floating dry dock, measuring 787.5 feet in length and 200.2 feet in breadth, with a registered depth of 17.0 feet. As a floating dry dock, the primary function of the Big "T" is to raise vessels out of the water to allow maintenance and repair of the normally underwater portion of the vessel. The Big "T" performs this function by being partially submerged to permit a vessel to enter it. Once the vessel is in place, the Big "T" is floated to raise the ship and expose the underwater portion of the ship. The Big "T" was constructed by Kawasaki Heavy Industries, Ltd., in Japan, for sale to plaintiff Todd Shipyards Corporation. Since it is not self-powered, the Big "T" was towed from Sakaide, Japan, to Galveston, Texas. On this voyage, the Big "T" carried four people, cargo, and lifesaving and firefighting equipment. The structure was also equipped with navigation lights and was protected by marine insurance against damage or loss while in transit (the insurance also covered injuries to the crew). Since arriving in Texas, the Big "T" has been used exclusively in its ship repair capacity. Plaintiff intends to tow the Big "T" between plaintiff's various facilities along the United States Gulf and West Coast to perform the ship repair function. In the course of such movement, vehicles, equipment, and materials for shipyard operations at the destination facility may be transported aboard the Big "T". Plaintiff claims that these activities, coupled with the transportation of cargo during the towing of the Big "T" from Japan to the United States, justify classification of the Big "T" as a vessel for tariff purposes.

■ Although the definition of the term "vessel" is quite broad, "judicial precedent has limited the definition of 'vessel' for tariff purposes." [2] *United States v. Seagull Marine*, 67 CCPA 89, 93, C.A.D. 1251, 627 F.2d 1083, 1085 (1980), *rev'g* 475 F.Supp. 158 (1979). Specifically, "the scope of the term 'vessel' has been narrowed to limit duty free treatment to watercraft that are *instrumentalities* of commerce as opposed to *articles* of commerce." *Elizabeth River Terminals, Inc. v. United States*, 1 CIT 165, 170, 509 F.Supp. 517, 520 (1981) (emphasis in original) (quoting *Seagull Marine*, 67 CCPA at 93, 627 F.2d 1083). A "vessel" is not defined by "merely size and structure, or self-propulsion, but rather *capability* and *design* to serve as a means of transportation in water." *Elizabeth River*, 1 CIT at 169, 509 F.Supp. at 520 (emphasis in original). Thus, although courts have occasionally itemized characteristics that were helpful in determining classification as a vessel, the presence or absence of specific characteristics is not determinative.

■ This view is reflected in *Thayer v. United States*, 2 Ct.Cust.App. 526, 529,

---

**1.** General Headnote 1 provides generally for duties on articles imported into the United States.

**2.** The court does not agree with plaintiff's argument that "vessel" as defined by case law regarding the Rivers and Harbors Act, 33 U.S.C. §§ 409–15 (1982), is dispositive in this case. *See International Spring Mfg. Co. v. United States*, 85 Cust.Ct. 5, 8, C.D. 4862, 496 F.Supp. 279, 282 (1980), *aff'd*, 68 CCPA 13, C.A.D. 1257, 641 F.2d 875 (1981) ("[T]he definition of a term contained in a statute or regulation dealing with nontariff matters ... does not determine the common meaning of that term for tariff purposes."); *United States v. Mercantil Distribuidora*, 43 CCPA 111, 116, C.A.D. 617 (1956) ("Unless the tariff term should be shown to have been drafted with reference to the regulation, this court cannot avoid its duty of inquiring into the meaning intended for tariff purposes, which may or may not have been the same as that of the regulation."). Although the tariff and general definitions of "vessel" arise from the same words, time and precedent have varied those definitions.

T.D. 32,252 (1912), in which the court found that Congress did not intend the term "vessel" to include structures used for "temporary, fugitive, impractical, although possible, ... transportation of articles or things" on water. In this case, the fact that the Big "T" was used as a vessel in a fugitive manner as it was being transported from Japan to the United States is not determinative of its classification. Specifically, the fact that the Big "T" carried a crew, cargo, and lifesaving and firefighting equipment, had navigation lights, and was protected by marine insurance when it was towed from Japan to the United States does not make it an instrumentality of commerce and thus a vessel. This use was temporary and incidental to its main function as a floating dry dock. As a predecessor to the Court of Appeals for the Federal Circuit stated ten years after *Thayer,*

> [t]he fact that the structure has the shape of a vessel, or has been once used as one, or could by proper appliances be again used as such, cannot affect the question. The test is the actual status of the structure as being fairly engaged in or suitable for, commerce or navigation and as a means of transportation on water.

*Hitner Sons Co. v. United States,* 13 Ct. Cust.App. 216, 221, T.D. 41,175 (1922).

The recognition of the primary purpose of a structure as critical to its classification was also recognized in *United States v. Bethlehem Steel Co.,* 53 CCPA 142, C.A.D. 891 (1966), *cert. denied,* 386 U.S. 912, 87 S.Ct. 865, 17 L.Ed.2d 786, *reh'g denied,* 386 U.S. 987, 87 S.Ct. 1284, 18 L.Ed.2d 241 (1967) and in *Vancor Steamship Corp. v. United States,* 76 Cust.Ct. 4, 406 F.Supp. 810 (1976). *Bethlehem Steel* involved the classification of midbodies towed across the Atlantic Ocean. The appellate court found that the midbodies were not vessels at the time of importation because they made the trip across the ocean "for the exclusive purpose, and were designed and intended for no other reason than to serve as midsections of ore carriers." *Bethlehem Steel,* 53 CCPA at 153. Likewise, in *Vancor Steamship,* this court found that a forebody towed across the Atlantic Ocean

was not a vessel because it "made the trip across the ocean for the exclusive purpose, and was intended for no other reason than to be used in the rebuilding of an American flag vessel...." *Vancor Steamship,* 76 Cust.Ct. at 9, 406 F.Supp. 810. The Big "T" was designed as a dry dock—a means of lifting large ships out of the water so that they can be repaired. Its use as a transporter of cargo was temporary and incidental to the necessary towing of the Big "T" to Texas for use as a dry dock. Plaintiff notes that it intends to tow the Big "T" between its various facilities and argues that the carrying of cargo on these trips substantiates its claim that the Big "T" is a vessel. However, since the towing of the Big "T" between facilities will occur solely due to the need for the Big "T" to perform its ship repair function at these various sites, the incidental use of the Big "T" to carry equipment does not transform it from a dry dock into a vessel.

The fact that the Big "T" was designed as a dry dock also distinguishes the present case from *Elizabeth River. Elizabeth River* involved in part the classification of a barge that was purchased for use as a crane platform. 1 CIT at 166, 509 F.Supp. at 518. This court classified the structure in question, the *Cambria,* as a vessel. In so doing the court stated: "There is no question that [the *Cambria*] had been designed and intended for use as a means of transportation in water. Furthermore, there is no evidence that it had undergone any major structural alterations to change this primary purpose or capability." *Id.* at 170, 509 F.Supp. at 521. Unlike the *Cambria,* the Big "T" is *not* designed nor is it intended for use as a means of transportation in water. Instead, its function is to serve as a dry dock for the repair of large ships and it has in fact served exclusively in this capacity since reaching the United States.

The Big "T" was designed for use as a dry dock. Therefore, the fugitive use of the structure to transport cargo does not transform the Big "T" from a dry dock into a vessel, for tariff purposes. Accordingly,

defendant's motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied. This case is hereby dismissed.